587 A.2d 687

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Gary Michael HEIDNIK, Appellant.**

Supreme Court of Pennsylvania.

Argued Dec. 3, 1990.

Decided March 7, 1991.

A. Charles Peruto, Jr., for appellant.

462

Gaele McLaughlin Barthold, Deputy Dist. Atty., Ronald Eisenberg, Chief, Appeals Div., Hugh J. Burns, Jr., Robert A. Graci, Chief Deputy Atty. Gen., for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, ZAPPALA, PAPADAKOS and CAPPY, JJ.

## OPINION OF THE COURT

LARSEN, Justice.

On July 1, 1988, a jury in the Court of Common Pleas of Philadelphia County convicted appellant, Gary M. Heidnik, of two counts of murder of the first degree, six counts of kidnapping, five counts of rape, four counts of aggravated assault and two counts of involuntary deviate sexual intercourse. Following the verdict of guilty of two counts of murder of the first degree, a separate sentencing hearing was held pursuant to 42 Pa.C.S.A. § 9711, and the same jury sentenced appellant to death for each of the convictions of murder of the first degree.[1] Post verdict motions were argued and denied, and the trial court imposed the sentences of death on March 2, 1989.

Following the imposition of sentence, appellant filed a direct appeal in this Court.[2] Appellant has since expressed his desire to have his execution carried out as expeditiously as possible and has, consequently, instructed counsel not to pursue the aforesaid appeal. The purpose of an automatic direct appeal to this Court of a sentence of death is to ensure that the sentence comports with the Commonwealth's death penalty statute. *Commonwealth v. Appel*, 517 Pa. 529, 539 A.2d 780 (1989). In addition to our statutory obligation, this Court is required to review the sufficiency of the evidence for all death penalty convictions.

1. Appellant was sentenced by the trial judge to cumulative sentences on the other aforesaid felony convictions for an additional cumulative term of imprisonment of 150 to 300 years.

2. This Court has direct appellate jurisdiction over such appeals. 42 Pa.C.S.A. §§ 722(4) and 9711(h)(1); Pa.R.A.P. 702(b). Appellant's other felony convictions were not appealed.

*Commonwealth v. Zettlemoyer,* 500 Pa. 16, 454 A.2d 937 (1982), *cert denied,* 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983).

■ When testing the sufficiency of the evidence, the applicable standard of review is whether, viewing all the evidence in the light most favorable to the Commonwealth as verdict winner, a jury could find every element of the crime beyond a reasonable doubt. *Commonwealth v. Bryant,* 524 Pa. 564, 574 A.2d 590 (1990). In accordance with this standard, we find the evidence, as now set forth, sufficient beyond a reasonable doubt to sustain the jury's verdicts of murder of the first degree.

■ On March 24, 1987, the Philadelphia Police Department received a telephone call from a woman who stated that she had been held captive for the last four months. When police officers arrived at the pay phone from which the call was made, they observed a woman who was "visibly shaken" and who repeatedly stated to the officers, "You have to help me." (N.T. 6/21/88 at 274). After the officers were able to calm the woman, Josephina Rivera, she told them that she had been held captive in a basement by a man named Gary Heidnik (appellant) for the last four months and that three other women were still being held in the basement. Ms. Rivera explained that appellant was parked nearby, waiting for her to return from what appellant believed was a visit to her family.

Ms. Rivera also told the officers that appellant had killed two of the women he had held captive and that she feared for the lives of the three women remaining in the basement. Ms. Rivera provided the officers with a description of appellant and told them where he was parked. When the officers apprehended appellant, he asked, "What's this all about, Officer? Didn't I pay my child support?"

Proceeding upon the information Ms. Rivera had supplied, police officers entered appellant's home in North Philadelphia. In the basement of the home were two females lying on a mattress. The women were naked from the waist

down, and their bodies were bruised. On the ankle of each woman was a heavy shackle with a long chain. In a corner of the basement the officers removed bags of dirt from a board covering a hole. In the hole lay a naked woman with her hands handcuffed behind her back and her ankle shackled. On returning to the first floor, the officers found in the kitchen six plastic bags containing human body parts.

Josephina Rivera and the women found by police in appellant's basement on March 24, 1987 had been brought there by appellant under similar circumstances over a period of four months. Each had agreed to accompany appellant to his home after being approached by him as he drove along the streets of North Philadelphia. Each had engaged in consensual sex with him before being choked until unconscious. While unconscious, each was carried to appellant's basement and chained to a sewer pipe. As many as three women at a time were confined in the hole appellant had dug in the basement floor. Each of the women was beaten by appellant, and with the exception of the last woman taken captive, each was raped by appellant repeatedly. Although Josephina Rivera and the three women rescued on March 24, 1987 survived the brutalities inflicted on them by appellant, two other captives, Sandra Lindsay and Debra Dudley, did not.

In addition to beating and raping the captive women, appellant had devised a separate system of punishment for any of the women who screamed for help or attempted to escape. One method of punishment consisted of forcing the disobedient woman to stand suspended by her handcuffed wrist from a hook which appellant had installed in the basement rafters. Such punishment was administered to Sandra Lindsay for a period of three or four days in the first week of February, 1987. During that time, and for the preceding week, Ms. Lindsay was fed only bread and water. Also during that time, appellant forced one of the other captives to beat Ms. Lindsay because Ms. Lindsay was

taking too long to eat the bread she was given.[3]  On the third or fourth day of her punishment, Ms. Lindsay collapsed after telling the other women that she felt sick. Appellant removed the handcuff from Ms. Lindsay's wrist and kicked her body into the hole in the basement floor. When appellant was unable to find Ms. Lindsay's pulse, he announced to the other women that Ms. Lindsay was dead and carried her body to the kitchen.  He then decapitated and dismembered the body.  Ms. Lindsay's head was placed in a large pot on the stove and boiled.  Other of her body parts were shredded in a food processor and mixed with dog food, which appellant then fed to the other women.  Still other parts of Ms. Lindsay's body were put into plastic bags and placed in his freezer.

In mid-March, appellant showed Ms. Lindsay's head, still in the pot on his stove, to another of the captives, Debra Johnson Dudley.  Appellant told Ms. Dudley that unless she changed her attitude she would end up the same way Ms. Lindsay did.  Appellant had previously stated to Ms. Rivera that he considered Ms. Dudley to be "a pain in the ass" and that he "wanted to get rid of her."  (N.T. 6/20/88, p. 231, p. 154).  On March 17, 1987, appellant administered an electrical shock to Ms. Dudley and two of the other captives as they lay trapped in the basement hole which appellant had filled with water.  Appellant attached an electrical wire to Ms. Dudley's metal chain causing her to scream out in prolonged pain.  When Ms. Dudley's screaming stopped abruptly, appellant lifted the board covering the hole and removed Ms. Dudley's body.  Appellant then placed the body in a freezer in his basement; he later disposed of the body in a state forest in New Jersey.  After Ms. Dudley's death, appellant ordered Josephina Rivera to write the following note: "Gary Heidnik and Josephina Rivera electrocuted Debra Dudley on March 17th in the basement of 3520 North Marshall Street by electrocution."  (N.T. 6/20/88 at 161).  Appellant then told Ms. Rivera that she

3.  Ms. Lindsay had a deformed jaw which prevented her from closing her mouth completely.

would no longer need to be handcuffed because the incriminating note would prevent her from going to the police. Appellant also told Ms. Rivera that, even if he were arrested, he would simply go into court and "act crazy" by saluting the judge, among other things. Appellant explained to Ms. Rivera that somewhere in the law it states that if a person acts crazy for a certain amount of years, his case is eventually thrown out. (N.T. 6/20/88, p. 168).

Appellant's mental condition at the time Sandra Lindsay and Debra Dudley died was an issue at trial. Appellant called three expert witnesses to establish that he was legally insane at the time of the deaths. The test for legal sanity and criminal responsibility in this Commonwealth is to be determined under the *M'Naughten* rule. *Commonwealth v. Banks*, 513 Pa. 318, 521 A.2d 1 (1987), *cert. denied*, 484 U.S. 873, 108 S.Ct. 211, 98 L.Ed.2d 162 (1987). Under *M'Naughten*, a defendant is legally insane and absolved of criminal responsibility if, at the time of committing the act, due to a defect of reason or disease of mind, the accused either did not know the nature and quality of the act or did not know that the act was wrong. *Commonwealth v. Tempest*, 496 Pa. 436, 437 A.2d 952 (1981). In order for insanity to constitute a defense, a defendant must prove insanity by a preponderance of the evidence. 18 Pa.C.S.A. § 315(a).

Dr. Clancy McKenzie, the first of two psychiatrists called by appellant, testified that appellant suffered from schizophrenia and that during the period in question appellant did not know right from wrong and was unable to understand the nature and quality of his acts. Dr. McKenzie stated that appellant's conduct during this time period was controlled by an "infant brain" with the chronological age of seventeen months. Dr. McKenzie reached this conclusion based on the fact that appellant's mother gave birth to another child when appellant was seventeen months old. When appellant's estranged wife notified appellant in October, 1986 that she had had a baby, Dr. McKenzie concluded that, "This took him back to the first time when the most

important woman in the world to him, his mother, left him and had a baby. And at that point, the trauma in the present [being told that his estranged wife had borne a child] returned him to a trauma at age seventeen months, and he began to experience the world through the eyes of the seventeen month old. The reality is that mommy is never going to go away and leave me again." (N.T. 6/22/88, p. 622).

Dr. Kenneth Kool, the second psychiatrist called by appellant, testified as to appellant's long-standing schizophrenic illness. Dr. Kool testified that appellant's schizophrenia affected him in such a manner that it prevented appellant from knowing the difference between right and wrong. It was Dr. Kool's opinion that appellant's acts were based on a "systematized delusion that God wanted him to produce a number of children, and this was essentially to him like a pact with God." (N.T. 6/24/88, p. 909).

The third of appellant's expert witnesses was Jack A. Apsche, Ph.D., an expert in the field of counseling psychology. Dr. Apsche reviewed appellant's lengthy record of treatment for mental disorders dating back to 1962 and concluded that appellant did not know right from wrong and could not understand the nature and quality of his acts between November 26, 1986 and March 24, 1987, the period during which Ms. Lindsay and Ms. Dudley were murdered.

The Commonwealth presented several witnesses to rebut appellant's insanity defense. Dr. Robert Sadoff, a forensic psychiatrist, testified that he had attempted to examine appellant but that appellant did not respond to any of the questions he was asked. Dr. Sadoff testified that appellant did, however, respond to his attorney's presence by saluting him. Dr. Sadoff thereafter reviewed appellant's extensive medical and psychiatric history, as well as information involving appellant's financial dealings, and his prior involvement with the criminal justice and family court systems. It was Dr. Sadoff's opinion that although appellant suffered from schizophrenia, his conduct between November 26, 1986 and March 24, 1987 indicates that his cognitive

ability was intact and that he was able to understand the nature and quality of his acts at the time. Doctor Sadoff testified that appellant's behavior during the relevant time (November 26, 1986 to March 24, 1987) showed that appellant knew what he was doing and knew that it was wrong. Other Commonwealth rebuttal witnesses included the following:

1) Ernestine Simpson, a social worker at a state hospital in New Jersey, testified that she interviewed appellant in the Fall of 1986 in order to determine whether appellant was sufficiently responsible to escort a patient, appellant's ex-wife, off hospital grounds. Ms. Simpson determined that appellant was sufficiently responsible and recalled that she viewed appellant as being neat, clean, courteous, calm, rational and intelligent.

2) Robert Kirkpatrick, appellant's stockbroker since 1974, testified that appellant was an astute investor who had raised his portfolio from $1,500 to $531,702 and that appellant had last placed an order for a purchase of stocks on November 17, 1986.

3) Shirley Carter, an acquaintance of appellant since 1978, testified that she had conversed with appellant in October and November of 1986. She testified that appellant's behavior appeared to be the same as it had been over the previous eight years.

4) Harold Wexler, a court reporter who had recorded proceedings involving appellant in family court in January of 1987, read the entire transcript of these family court proceedings to the within jury. The within trial court, in its Opinion in support of its Order denying appellant's post trial motions, characterized Appellant's behavior during the family court proceedings as cunning and deceptive in answering questions about his true worth and his obligation to support his wife and son, both of whom were on welfare.

5) David Pliner, a car salesman who recalled appellant coming to his showroom in November, 1986 to purchase a Cadillac, testified that appellant acted just like any other

customer and that appellant had offered him advice on investing.

6) Richard W. Hole, M.D., a psychiatrist at the Veterans' Out–Patient Clinic in Philadelphia, testified that in December, 1986 appellant who had last been seen by Dr. Hole in February, 1986, asked to have his treatment reinstated. Appellant denied having any psychiatric symptoms, such as anxiety, hallucinations, depressions or delusions. Dr. Hole, nevertheless, prescribed thorazine, a tranquilizer widely used in managing schizophrenia, although he saw no ongoing problems at that time or when appellant returned in January and February of 1987.

7) Eva Wojciechowski, a court psychologist, testified that she had administered an intelligence test to appellant incidental to his attempt to gain partial custody of his son in March of 1987. Appellant's test showed that his I.Q. was 148. Ms. Wojciechowski testified that appellant's score placed him in the upper ½ of 1% of the total population.

The jury rejected appellant's insanity defense. Our review of the record establishes that the evidence is sufficient beyond a reasonable doubt to support the jury's conclusion that appellant was legally sane when he took the lives of Sandra Lindsay and Debra Dudley. And again, based upon the foregoing recitation of facts, we find the evidence to be sufficient beyond a reasonable doubt to sustain the jury's verdicts of murder of the first degree.

■ Our statutory obligation requires that we determine the following: 1) whether the sentences of death were the product of passion, prejudice or any other arbitrary factor; 2) whether the evidence fails to support the finding of at least one specified aggravating circumstance; or 3) whether the sentences are excessive or disproportionate to the penalty imposed in similar cases considering both the circumstances of the crime and the character and record of the defendant. 42 Pa.C.S.A. § 9711(h).

In the penalty phase of the proceedings, the jury found the existence of the following aggravating circumstances with regard to Ms. Lindsay's death: "... the defendant committed a killing while in the perpetration of a felony," 42 Pa.C.S.A. § 9711(d)(6); and "The offense was committed by means of torture," 42 Pa.C.S.A. § 9711(d)(8). For purposes of the sentencing statute, "torture" is understood as the infliction of a considerable amount of pain and suffering on a victim which is unnecessarily heinous, atrocious or cruel, manifesting exceptional depravity. *Commonwealth v. Pursell*, 508 Pa. 212, 495 A.2d 183 (1985). Sandra Lindsay's killing occurred during a kidnapping, supporting the finding that appellant committed a killing while in the perpetration of a felony. The evidence that Ms. Lindsay was hung by the wrist from a ceiling hook for three or four days, was fed only bread and water during that time, and was subjected to beatings as she hung from the hook is sufficient to support the finding of the sentencing jury that appellant killed Ms. Lindsay by means of torture.

With regard to Ms. Dudley's death, the jury found the existence of the same aggravating circumstances as were found in regard to Ms. Lindsay's death and found the following two additional aggravating circumstances: "... the defendant knowingly created a grave risk of death to another person in addition to the victim of the offense," 42 Pa.C.S.A. § 9711(d)(7); and "The defendant has been convicted of another murder, committed either before or at the same time of the offense at issue." 42 Pa.C.S.A. § 9711(d)(11). As with Ms. Lindsay, Ms. Dudley's death occurred during a kidnapping, supporting the jury's finding that appellant killed her during the perpetration of a felony. The evidence that Ms. Dudley's death occurred as the result of electrical charges being administered to her while she lay in a water-filled pit and screamed in agony, supports the jury's finding that Ms. Dudley also was killed by means of torture. The fact that two other women in metal chains were in that water-filled pit with Ms. Dudley when appel-

lant administered the electrical charge, supports the finding of a grave risk to others. The death of Ms. Lindsay, which occurred prior to Ms. Dudley's death, supports the finding of a murder committed before the offense at issue.

In addition to the foregoing aggravating circumstances, the sentencing jury found the existence of the following mitigating circumstance with regard to the murders of both Ms. Lindsay and Ms. Dudley: "The defendant has no significant history of prior criminal convictions." 42 Pa.C.S.A. § 9711(e)(1). The jury then unanimously found that this mitigating circumstance was outweighed by the aforementioned aggravating circumstances and, pursuant to 42 Pa.C.S.A. 9711(c)(1)(iv), fixed appellant's sentence at death for the murder of each woman.[4]

Finally, we have examined the record and find that the sentence of death was a product of the evidence and not a product of "passion, prejudice or any other factor." 42 Pa.C.S.A. § 9711(h)(3). Based upon data supplied by the Administrative Office of Pennsylvania Courts (see *Commonwealth v. Frey*, 504 Pa. 428, 475 A.2d 700, cert. denied, 469 U.S. 963, 105 S.Ct. 360, 83 L.Ed.2d 296 (1984) and the Appendix attached thereto), we conclude that the sentences of death imposed upon appellant are neither excessive nor disproportionate to the penalty imposed in similar cases, considering the circumstances of the crime and the record of the accused.

For the foregoing reasons, we sustain the convictions of murder of the first degree and affirm the sentences of death.[5]

4. Section 9711(c)(1)(iv) provides:
   the verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance specified in subsection (d) and no mitigating circumstance or if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances. The verdict must be a sentence of life imprisonment in all other cases.

5. The Prothonotary of the Supreme Court of Pennsylvania is directed to transmit the full and complete record of the trial, sentencing

472

McDERMOTT, J., did not participate in the consideration or decision of this case.

hearing, imposition of sentence and review by this Court to the Governor.  42 PA.C.S.A. § 9711(i).