665 A.2d 439

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Anthony PAOLELLO, Appellant.**

Supreme Court of Pennsylvania.

Argued March 8, 1995.

Decided Sept. 22, 1995.

48

50

Joseph P. Burt, Assistant Public Defender, for Appellant.

William R. Cunningham, District Attorney, James K. Vogel, Assistant District Attorney, Anthony R. Himes, Assistant District Attorney, Robert A. Graci, Chief Deputy Attorney General, for Appellee.

Before NIX, C.J., and FLAHERTY, ZAPPALA, CAPPY, CASTILLE and MONTEMURO, JJ.

## OPINION OF THE COURT

CAPPY, Justice.

This is an automatic direct appeal from the imposition of a sentence of death.[1] Following a trial by jury, Appellant was convicted of murder in the first degree, 18 Pa.C.S. § 2502(a), two counts of aggravated assault, 18 Pa.C.S. § 2702, two counts of conspiracy to commit assault, 18 Pa.C.S. § 903, and one count of conspiracy to commit murder, 18 Pa.C.S. § 903.[2] For the reasons that follow we affirm all of the above convictions, reverse the penalty of death, and remand for the imposition of a life sentence.

█ We will begin our review of this case by first addressing the sufficiency of the evidence. This Court has a duty to conduct an independent review to determine if the evidence is

1. *See,* 42 Pa.C.S. §§ 722(4), 9711(h)(1); Pa.R.A.P. Rule 702(b).

2. In addition to the sentence of death, Appellant was sentenced to terms of imprisonment on the remaining counts of five to ten years concurrent to the sentence of death and twelve and one-half years to twenty-five years consecutive to the sentence of death.

sufficient to sustain the underlying conviction for murder in the first degree in all cases where a sentence of death has been imposed.[3] *Commonwealth v. Green,* 536 Pa. 599, 640 A.2d 1242 (1994); *Commonwealth v. Zettlemoyer,* 500 Pa. 16, 454 A.2d 937 (1982), *cert. denied,* 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), *reh'g denied,* 463 U.S. 1236, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983). Much of the Commonwealth's evidence in this case is circumstantial, thus requiring that the facts be set forth in depth.

The events which culminated in Appellant's convictions on the above-listed charges began on October 1, 1992 and ended on October 4, 1992 with the discovery of the body of James Stanley in an alley near the building where Stanley and Appellant resided. At the time period in question, Appellant and Stanley were residents of a rooming house at 2516 Peach Street in Erie, Pennsylvania. Their rooms were directly across the hall from one another, and they shared a common sitting room/kitchen with each other and one additional resident of the third floor.

Sometime in September of 1992, Stanley had befriended Allen Gaffield while sharing a drink together on the railroad tracks in the area near the Peach Street rooming house. Stanley invited Gaffield to share his room. While staying with Stanley, Gaffield met Appellant and his co-defendant, Daniel Funt.[4] According to Gaffield's testimony, he, Appellant, and Funt were sharing a drink together in the common area late on the afternoon of October 1, 1992, when Appellant and Funt attacked him from behind, without provocation. Gaffield testified that he was severely beaten and rendered unconscious. At the time of the beating he had been wearing black jeans and a tee shirt. Upon regaining consciousness Gaffield realized that his own clothes were missing, and he was clad in a

---

**3.** Although we find it necessary to reverse the death penalty and remand for a life sentence, as Appellant has challenged the sufficiency of the evidence supporting his conviction for first degree murder we must review same.

**4.** Daniel Funt was tried with Appellant and convicted of murder in the third degree, his appeal is not presently before this Court. A third co-conspirator, Anthony DeFranco, was tried separately.

pair of pants that were too large, that he did not recognize, and no shirt.

Gaffield then dragged himself into Stanley's room where he collapsed onto his sleeping bag at the foot of Stanley's bed. Gaffield awakened at some point on Friday to find that Stanley and a woman, Marlena Valenta, were also in Stanley's room. Stanley and Marlena were sharing a bottle of vodka and offered some to Gaffield; he declined. Gaffield testified that his injuries caused him to remain on the sleeping bag, wavering in and out of consciousness, for the entire day of October 2nd.

At some point around 2:30 a.m., October 3, 1992, Gaffield was awakened when the door to Stanley's room was kicked open by a man wearing a mask who entered the room and proceeded to severely beat Stanley. A second man was standing in the doorway holding a flashlight during the beating. The beating lasted about one minute and the man left. A few minutes later, a second man entered the room with a hood over his head. The second man also beat Stanley and kicked Marlena in the head. Gaffield said the man tried to beat him but stopped after only hitting him once in the face and once in the chest because Gaffield told the man he had already been beaten. This second attack also lasted about one minute. Another brief pause occurred and then a third man entered the room. The third man was positively identified by Gaffield as the Appellant. Gaffield also identified a pair of light colored shorts with thin stripes that Appellant was wearing during the attack. Gaffield testified that Appellant knocked Stanley to the floor, then picked Stanley up from the floor and continued to beat him, finally dropping Stanley back on the floor at the foot of the bed. During this final encounter, Gaffield begged Appellant to stop.

When the third attack ended Gaffield heard the assailants in the hallway and the man in the hood say: "We're the Hood. If you F with our cocaine and money again, we'll come back and kill you." After that, the Appellant came back into the room and acted unaware of what had transpired. Appellant attempted to offer Stanley assistance and then took Marlena

by the hand and led her back to his own room across the hall. Gaffield testified that he and Stanley then went to sleep. Later that morning, Saturday, October 3, 1992, at 9:00 a.m., Gaffield walked across the street to the Rite–Aid pharmacy seeking assistance. The manager of Rite–Aid called an ambulance and Gaffield spent the next ten days in intensive care with multiple rib fractures, contusions, and punctures in both lungs. According to Gaffield, Stanley refused to seek medical attention.

Marlena Valenta testified to the same scenario of three separate assaults as Gaffield. However, Marlena testified that Gaffield was kicked by the second assailant. Marlena also identified Appellant as the third assailant. After being led into Appellant's room, Marlena observed Daniel Funt with what appeared to be fake blood on his face. Funt told Marlena that he had chased three black men out of the building and had been injured in the process. Marlena testified that after having a drink to calm her nerves she went to sleep.

Through-out the day and evening of Saturday October 3, 1992, Marlena testified Appellant kept her out of Stanley's room. Appellant told Marlena that Gaffield had gone to the hospital in an ambulance and that Stanley was resting. On three separate occasions during the course of the day she observed Appellant fill a large glass with vodka which he said he was giving to Stanley. Marlena testified that except for a brief period of time on Saturday morning when she was sent to the home of Appellant's wife, Chris Paolello, Appellant kept her in his room.

On Sunday morning, Appellant again sent Marlena to his wife's house, which was across the street from the rooming house. While with Appellant's wife, Marlena learned that Stanley's body had been found in the alley. When she returned to Appellant's room, he told her to stay quiet because she might incriminate herself. Marlena stayed in Appellant's room through Monday morning.

On Monday, October 5, 1992, Marlena went to the Erie welfare office to register for benefits. While at the office, she told the story of the beating to Hugh Price who was also waiting at the office to register for benefits. The conversation was triggered by the fact that Mr. Price was reading the morning paper containing a story on the discovery of a body in the alley off Peach Street. Marlena told Price she was there and knew about the body. Marlena also told the story of the beatings to Cheryl Moore an employee of the welfare office who conducted the interview with Marlena. Officer Gerald McShane testified that he received a phone call from Price on October 5, 1992 relating the conversation with Marlena, identifying her as a possible witness in the death of James Stanley.

Marlena returned to the rooming house on Monday after her visit to the welfare office. On Tuesday afternoon, October 6, 1992 Detective DiPaulo of the Erie police returned to the rooming house specifically looking for Marlena. Appellant denied knowing anyone by that name and when Detective DiPaulo asked the identity of the woman in Appellant's room he initially said it was his wife, then amended that to his girlfriend; finally Appellant admitted that it was the woman ⸵he⸴ were looking for. Marlena agreed to cooperate with the Detective and left the building in his custody. Before leaving the rooming house, the Detective searched Appellant's room and Daniel Funt's room.[5] In Funt's room the Detective observed a vial containing fake blood.

Andrew Richardson, another resident of the Peach Street rooming house who lived on the floor below Appellant, testified that after Stanley's body was found, Appellant warned him not to talk to the police about the fights that went on upstairs. Richardson testified that Appellant seemed nervous and also said that Appellant had ignored him before Stanley's death, but afterwards came to him often during the police investigation. On October 6, 1992, Richardson told police about his conversations with Appellant.

5. The Officer's search at this point in time was with the consent of Appellant and Funt. The consent is not challenged in this appeal.

Linda Marlowe testified that her husband, Brian Marlowe, was a friend of Appellant's co-conspirator, Anthony DeFranco. In October of 1992, while Brian was a resident of the Erie County jail, Linda discovered a pair of men's white shorts with thin stripes in her barbecue grill. Linda testified that Sue Brasington, a girlfriend of Anthony DeFranco, placed the shorts in the grill. After discussing the matter with Brian, Linda put the shorts in a plastic bag and placed the bag in the trunk of her car. On October 14, 1992, after further discussions with Brian, Linda arranged for the Erie police to retrieve the shorts.

John Robertson, a forensic criminalist, testified that the blood stains on the shorts positively matched the blood type of James Stanley. Both Allen Gaffield and Marlena Valenta identified the shorts as being the same as the shorts worn by Appellant at the time Stanley was beaten. Christine Tomsey, a forensic scientist, conclusively matched the DNA in the blood found on the shorts with that of James Stanley, and further conclusively excluded the DNA in the blood stain on the shorts from matching the DNA of Appellant.

Detective Brian Michael Zimmer, the investigator in charge of the investigation into the death of Stanley, questioned Appellant on Sunday October 4, 1992. Appellant told Zimmer that he had not seen Stanley since 7:30 a.m., Saturday October 3, 1992.

Paul Cooper testified that while in jail he and Appellant became acquainted. Cooper testified that Appellant approached Cooper during his martial arts exercises; Appellant ostensibly sought to work out with Cooper as he professed a background in martial arts. Cooper testified that Appellant admitted to him the role Appellant played in the death of James Stanley. According to Cooper, Appellant was concerned that he would be linked to the death of Stanley because Anthony DeFranco had given Appellant's bloody shorts to Brian Marlowe, who in turn had delivered them to the police. Cooper testified that Appellant told him that he, DeFranco, and another guy beat Stanley. The two other people began the beating while Appellant waited in the hall listening. Ap-

pellant was the last person to deliver blows to Stanley. Cooper asked Appellant why he had done this, and Appellant responded that he was angry with Stanley for bringing Gaffield into the rooming house and letting him stay there without paying rent. Appellant told Cooper that Gaffield was noisy and always drunk.

Appellant told Cooper that after the beating he was concerned that the police would investigate because of the noise and find Stanley and Gaffield all beat up. Appellant said Stanley wanted to go to the hospital but Appellant wouldn't let him and instead kept giving Stanley vodka until he couldn't drink anymore. Appellant said he told Gaffield to go to the hospital but told Stanley, "the only doctor your going to see is this vodka." Appellant then told Cooper that he and the two co-conspirators dumped Stanley in the alley. Cooper asked Appellant why he killed Stanley, and Appellant responded "he was just a drunk from out of town, beat to death and died, and that's all we thought it would come to."

The discovery of Stanley's body was made by two roofers working on a building abutting the alley. When the police arrived they observed the body and noted that it was severely battered and appeared to have been dragged through the dirt. Stanley was found lying on his back yet his mouth, nose, eyes and the toes of his shoes were full of dirt. While searching the immediate area for evidence, an officer discovered a tee shirt and black jeans in a burn barrel near the body. Gaffield later identified the clothing as the items he had been wearing on Thursday, October 1, 1992.

Doctor Imajo was the pathologist who performed the autopsy on James Stanley. He testified that death was equally attributed to two causes: trauma and alcohol poisoning. The doctor testified that death ultimately occurred through respiratory failure. Stanley had received multiple trauma wounds, with fifteen (15) separate rib fractures on the right side, and twelve (12) separate rib fractures on the left side of his body. At the time of death, the blood alcohol level in Stanley's body was 3.9%; in the doctor's opinion, 3.6% blood alcohol is lethal. At the time of death, Stanley had a full bladder with an

extremely high alcohol-urine content which led the doctor to conclude with a reasonable degree of medical certainty that Stanley was in an alcohol induced coma at the time his respiratory system shut down, thus, bringing about death.

Christine Paolello and Fatima Paolello, Appellant's wife and daughter, testified that each of them observed Appellant offering care and nourishment to Stanley through-out the day on Saturday October 3, 1992. Christine testified that on Saturday morning she watched Appellant prepare coffee for Stanley and try to persuade him to go to the hospital. Fatima said she stayed with her father all day Saturday until 8:30 p.m., and observed him bring coffee and soup to Stanley through-out the day.

Doctor Fust, a forensic pathologist, testified as a defense witness that the cause of death was solely attributable to alcohol poisoning. In his opinion the beating alone would not be sufficient to cause Stanley's death.

 In order to prove murder of the first degree the Commonwealth must show that a human being was unlawfully killed, that the accused committed the killing, and that the killing was done in an intentional, deliberate and premeditated manner. *Commonwealth v. Mitchell*, 528 Pa. 546, 599 A.2d 624 (1991). The element which distinguishes first degree murder from all other degrees of criminal homicide is the presence of a willful, premeditated and deliberate intent to kill. This essential element of intent may be proven by circumstantial evidence. *Commonwealth v. Williams*, 455 Pa. 539, 316 A.2d 888 (1974). In *Williams*, this Court directly addressed the issue of establishing the element of intent through circumstantial evidence.

In *Williams*, the decedent, Mrs. Amos, had been burned, thus making a determination of the exact cause of death extremely difficult. However, this Court in viewing all the evidence and all reasonable inferences arising therefrom, found that the Commonwealth had established beyond a reasonable doubt that Mrs. Amos had been killed via criminal means and that the defendant had purposely, willfully and

deliberately caused Mrs. Amos' death. This Court reached that conclusion by a review of all the facts attendant upon the death of Mrs. Amos and particularly the attempt by the defendant to mislead the police concerning the disappearance of Mrs. Amos.

> That the killing was willful and deliberate and but a part of a well-planned attempt to kill and conceal is suggested by the well-conceived attempt at deception practiced by the appellant. The care with which the plan to divert suspicion from appellant was executed and the obvious attention to details contradict the possibility of a spontaneous cover-up following an accidental or unintentional killing. Under these facts a jury was able to conclude that the entire design including the killing had received much prior thought and planning.

*Williams* at 548–49, 316 A.2d at 892.

■ In light of this Court's decision in *Williams,* we conclude upon reviewing the facts established in the case at bar, that sufficient evidence was established by the Commonwealth from which the jury could reasonably conclude that Appellant, along with his co-conspirators, engaged in a deliberate course of conduct with the willful deliberate intent to kill James Stanley. From the evidence presented, it is reasonable to conclude that in the present case, Appellant and his co-conspirators developed an elaborate scheme to beat Stanley and lay the blame on three persons allegedly in a gang known as the "Hood." This scheme involved the use of masks and fake blood. Then, in an effort to divert blame from themselves regarding the beating, Appellant, along with the co-conspirators, knowingly caused Stanley to swallow a lethal dose of alcohol and dumped his body in an alley. By leaving the bruised and alcohol filled body in the alley, Appellant planned that the police would assume Stanley had brought about his own demise through drinking. As Appellant told Cooper: "He was just a drunk from out of town, beat to death and died, and that's all we thought it would come to." Sufficient circumstantial evidence was presented to the jury from which they could reasonably conclude that Appellant and his

co-conspirators knowingly denied Stanley necessary medical treatment, and instead forced him to ingest a lethal amount of vodka, purposely and intentionally causing his death. We find the evidence was sufficient to establish that Appellant killed James Stanley, and that the killing which occurred by deliberate, willful, premeditation, was murder in the first degree.

We now turn to the remaining issues presented in this appeal. We will address the issues in the following order: pre-trial, trial, ineffectiveness of trial counsel, and then penalty phase.[6]

### Pre-trial

██ Appellant's initial claim of error challenges the probable cause for his arrest. Appellant was initially arrested on October 6, 1992 and charged with the rape of Marlena Valenta.[7] Appellant asserts that the arrest was fraudulent. He argues that the police could not have reasonably believed that he raped Ms. Valenta, and that they only arrested him on those charges in order to question him regarding the murder of James Stanley. Essentially, Appellant argues that Ms. Valenta is not credible.

Appellant fails to assert any evidence from which this Court could possibly ascertain the credibility of Ms. Valenta' assertion to the arresting officer that she had been raped by Appellant. We do note, however, that a district justice issued a warrant for Appellant's arrest on the charge of rape after reviewing an affidavit of probable cause which alleged that Ms. Valenta complained to the affiant that she had been raped, beaten and bitten by Appellant and that the affiant had in fact observed bruises and bite marks upon Ms. Valenta. We further note that following the preliminary hearing on the rape charges, a prima facie case was found and the matter

6. Appellant's brief is poorly organized. The issues are numerous, repetitive and contain multiple, often unrelated, subparts. In our discussion of the issues we have attempted to organize them in a logical sequence.

7. The rape charges were severed from, and scheduled to be tried after, the homicide and assault charges which are at issue herein.

held for court. Thus, on the basis of all the facts of record, we cannot conclude that the arrest on the charge of rape was a sham.[8]

In addition, within this same allegation of error, Appellant claims that the search of his room subsequent to the arrest on the rape charge and any questioning of him by the arresting officer must also be suppressed as the arrest was invalid. First, we take note of the fact that Appellant does not point to any specific evidence which was obtained in the search of his room, nor does he direct this Court to any statements made to the arresting officer which he now claims should be suppressed. Regardless of this deficiency in Appellant's argument, as we do not agree that the arrest was invalid, we find these claims are without merit.

The next issue Appellant raises centers upon the pretrial publicity generated in this case. Appellant asserts that the publicity in this matter was intensive, pervasive, inflammatory and so prejudicial that it prohibited the selection of a fair and impartial jury. In the face of such intense publicity Appellant asserts that the trial court erred in failing to grant his request for a change of venue, and, in further failing to grant his request that the jury be sequestered.

In *Commonwealth v. Gorby*, 527 Pa. 98, 588 A.2d 902 (1991), this Court set forth the standard for reviewing a claim that the trial court erred in denying a request for change of venue.

> The determination of whether to grant a change of venue rests within the sound discretion of the trial court whose decision thereon will not be disturbed on appeal absent an abuse of that discretion. *Commonwealth v. Buehl*, 510 Pa. 363, 508 A.2d 1167 (1986). In reviewing the trial court's decision, our inquiry must focus upon whether any juror formed a fixed opinion of the defendant's guilt or innocence

---

8. We note that even if the arrest were invalid it would not bar Appellant's subsequent indictment and conviction. *Commonwealth v. Carter*, 537 Pa. 233, 248, 643 A.2d 61, 68 (1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1317, 131 L.Ed.2d 198 (1995).

as a result of the pre-trial publicity. *Commonwealth v. Bachert*, 499 Pa. 398, 453 A.2d 931 (1982). Pre-trial publicity will be deemed inherently prejudicial where the publicity is sensational, inflammatory, slanted towards conviction rather than factual and objective; revealed that the accused had a criminal record; referred to confessions, admissions or re-enactments of the crime by the accused; or derived from reports from the police and prosecuting officers. *Commonwealth v. Pursell*, 508 Pa. 212, 495 A.2d 183 (1985). However, even if one of these elements exists, a change of venue will not be required where there has been sufficient time between publication and trial for the prejudice to dissipate. *Commonwealth v. Casper*, 481 Pa. 143, 392 A.2d 287 (1978).

*Gorby*, 527 Pa. at 108, 588 A.2d at 906.

A change of venue becomes necessary when a fair and impartial jury cannot be selected. In the instant case, the assaults and murder occurred early in October of 1992. The last media publication referenced by Appellant concerning those events is dated October 22, 1992. Jury selection in this case began on June 22, 1993. During the individual voir dire of seventy-one jurors, only two potential jurors indicated that they had formed fixed opinions about the case as a result of information obtained through the media. Each of those jurors was dismissed for cause. Although many of the remaining panel indicated some familiarity with the murder itself, their recollections were vague and each of the remaining jurors stated that the media information they had heard or read had not caused them to develop a preconceived opinion about the case. Accordingly, the trial court did not err in denying the Appellant's request for a change of venue.

Appellant additionally asserts that the trial court erred in denying his request to sequester the jury. Sequestration is a matter left within the sound discretion of the trial court, and may be utilized at any time during the course of the trial when the interests of justice so require. Pa.R.Crim.P., Rule 1111(a). In order to establish that the trial court has

abused its discretion in denying a request to sequester the jury, Appellant must allege potential prejudice. *Gorby*, 527 Pa. at 110, 588 A.2d at 908. As in the issue regarding change of venue, Appellant again references the extensive pre-trial media coverage of the murder and assaults in support of his request for sequestration. The existence of pre-trial publicity is not in and of itself sufficient to warrant sequestration. As previously discussed, voir dire revealed the fact that this jury panel was not so inundated with prejudicial publicity as to have formed a fixed opinion of Appellant's guilt. As the petit panel was not predisposed due to pre-trial publicity, and the trial court cautioned the jurors to avoid publicity during the course of the trial, in the absence of specific allegations of prejudice we must conclude that the trial court did not err in denying the request to sequester the jury.

Appellant next asserts two allegations of error involving the voir dire process. First, Appellant asserts that the trial court erred in failing to intervene to rehabilitate jurors that were excluded by the Commonwealth, and thus, allowed the Commonwealth to empanel a "death qualified" jury. This Court has repeatedly stated that the purpose of voir dire is to ensure the empaneling of a fair and impartial jury capable of following the instructions on the law as provided by the trial court. *Commonwealth v. Jermyn*, 533 Pa. 194, 620 A.2d 1128 (1993), *cert. denied, Jermyn v. Pennsylvania*, —— U.S. ——, 114 S.Ct. 703, 126 L.Ed.2d 669 (1994), (reaffirming *Commonwealth v. Jermyn*, 516 Pa. 460, 533 A.2d 74 (1987), *cert. denied, Jermyn v. Pennsylvania*, —— U.S. ——, 114 S.Ct. 703, 126 L.Ed.2d 669 (1994)). The selection of jurors who assert their ability to follow the law and impose the death penalty when the law so requires, does not mean that the jurors are prone to death as asserted. This argument has repeatedly been rejected by this Court. *See Commonwealth v. Blount*, 538 Pa. 156, 647 A.2d 199 (1994) (collecting cases).

The second allegation of error arising from voir dire concerns the trial court's refusal to permit Appellant's counsel to question the jurors during voir dire regarding their

opinions, attitudes, and involvement with alcohol. As stated above, the purpose of voir dire is to empanel a fair and impartial jury, not to empanel a jury sympathetic to positions or beliefs of either party. The decision on whether or not counsel may propose their own questions of potential jurors during voir dire is a matter left solely within the discretion of the trial court. Pa.R.Crim.P., Rule 1106(d). Voir dire is not to be utilized as a tool for the attorneys to ascertain the effectiveness of potential trial strategies. We find no error by the trial court in refusing this line of voir dire examination.

The final pre-trial allegation of error concerns the question of severance. Appellant requested a severance from his co-conspirator, Mr. Funt, and also requested a severance of charges regarding the October 1st assault on Mr. Gaffield and the October 3rd assaults on Gaffield and Stanley.

Joint trials are advisable when the defendants face conspiracy charges and where the multiple charges demonstrate a logical connection between the defendants and the various crimes charged. A motion to sever either defendants or charges is addressed to the discretion of the trial court and will not be disturbed on appeal absent a manifest abuse of that discretion. *Commonwealth v. Chester*, 526 Pa. 578, 587 A.2d 1367 (1991), *cert. denied*, 502 U.S. 959, 112 S.Ct. 422, 116 L.Ed.2d 442 (1991); *Commonwealth v. Lark*, 518 Pa. 290, 543 A.2d 491 (1988).

In support of his severance requests Appellant argues the following points. First, the third co-conspirator was severed, thus, severance from the remaining co-conspirator should also have been granted. The third co-conspirator, Anthony De-Franco, was not charged with any involvement in the October 1st assault on Gaffield, thus, the trial court granted a severance to avoid prejudice to DeFranco.

Second, Appellant asserts that the defense strategies of Appellant and Funt were antagonistic as Funt offered an alibi defense for October 3rd, while, Appellant claimed no involvement at all in either the October 1st nor the October 3rd assaults. As this Court stated in *Chester*, "[d]efenses

become antagonistic only when the jury, in order to believe the essence of testimony offered on behalf of one defendant, must necessarily disbelieve the testimony of his co-defendant." *Chester* at 590, 587 A.2d at 1373. The defenses of Appellant and Funt were not so antagonistic that severance was required.

Third, Appellant asserts that his decision on whether or not to testify in his own behalf was influenced by the fact that he was jointly tried with Funt. This assertion is belied by the record in this case where Appellant was specifically questioned by the trial court on his decision not to testify during trial, and he explicitly affirmed that he had knowingly and intentionally waived that right. Although Appellant's decision to forgo testifying may have been influence by the joint trial, that speculative inference is insufficient to warrant severance.

Fourth, Appellant argues that denial of a severance prevented him from calling Funt as a hostile witness because Funt could assert his Fifth Amendment right not to testify. Funt could assert the right not to testify whether or not the two men were tried together or separately. This assertion is specious.

Finally, on the severance of charges, Appellant argues that he was unduly prejudiced by the consolidation of the charges as the jury clearly considered the October 1st assault in reaching their decision to impose the death penalty. The fact that a defendant suffers prejudice from the admission of relevant evidence connecting him to the crimes charged is a natural consequence of criminal trials; it is not in and of itself grounds for a severance. *Lark*, 518 Pa. at 307, 543 A.2d at 499. The events on October 1st and the events on October 3rd were sufficiently related in nature, identity of individuals involved and character of conduct to merit a joint trial. We find no abuse of discretion in the trial court's refusal to sever the co-conspirators and/or charges.

## Trial

Turning now to the trial itself, we will first address Appellant's assertion that the verdicts were against the

weight of the evidence.[9] A challenge to the weight of the evidence requires the reviewing court to resolve questions of credibility, a function which is best undertaken by the trial court, not the appellate court. *Commonwealth v. Farquharson*, 467 Pa. 50, 59–60, 354 A.2d 545, 550 (1976). An appellate tribunal will not disturb the jury's determination of which evidence is worthy of belief, unless the testimony taken as a whole is so inherently unreliable that the verdict could only be based upon surmise and conjecture. *Commonwealth v. Karkaria*, 533 Pa. 412–13, 625 A.2d 1167, 1170 (1993).

Each of Appellant's assertions within this challenge to the weight of the evidence argues the believability of testimony offered by the Commonwealth.[10] Appellant merely asserts his interpretation of the trial evidence and requests this Court to reach a contrary result than the jury, based upon Appellant's theory of the case. This we will not do; having already found the evidence sufficient to establish that a killing occurred and that the Appellant deliberately, intentionally and with premeditation committed that killing, we cannot agree with Appellant's assertions that the very same evidence is without weight. In addition, our review of the sufficiency of the evidence as set forth above clearly establishes that the verdicts on the multiple charges of aggravated assault and criminal conspiracy were not against the weight of the evidence.

Appellant's next two allegations of error concern evidentiary rulings relating to the testimony of Marlena Valenta. Appellant first asserts that the trial court erred in permitting the testimony of Detective Sergeant DiPaolo, Cheryl Moore

9. Appellant's challenges here include the two aggravated assault convictions and the convictions on the three specific charges of criminal conspiracy, in addition to the verdict for first degree murder.

10. Specifically Appellant claims: the evidence as to the cause of Stanley's death was inconclusive; there was no direct evidence of Appellant force feeding alcohol to Stanley; there was no direct evidence that Appellant committed the beating of Gaffield on October 1st; the witnesses were not credible; there was no evidence that Appellant was the primary planner of the assaults; and the testimony as a whole was unreliable.

and Hugh Price regarding prior consistent statements of Marlena Valenta.

Prior consistent statements are normally not admissible as they are repetitious and cumulative, serving only to buttress testimony the jury has already received. The admission of prior consistent statements properly is limited to those instances where the testimony of the witness requires rehabilitation upon a challenge that the testimony was a recent fabrication, or the result of an improper motive. *Commonwealth v. Hutchinson*, 521 Pa. 482, 487–88, 556 A.2d 370–72 (1989).

Appellant argues that the testimony of the above-named witnesses was improper rebuttal, as Appellant never challenged the truthfulness of, or motive for, Marlena Valenta's testimony; rather he cross-examined Ms. Valenta only as to her ability to perceive events. Appellant asserts that the admission of the prior consistent statements under the circumstances of this case was purely motivated by the Commonwealth's desire to enhance the credibility of Ms. Valenta. Appellant's assertion is without merit. Both counsel for Appellant and counsel for Mr. Funt cross-examined Ms. Valenta at great length as to her ability to perceive and recall the events of October 3rd due to her high alcohol consumption. The cross-examination focused heavily upon her credibility in the sense that alcohol severely limited her ability to observe and remember the events at issue. Accordingly, the trial court properly permitted the use of Ms. Valenta's prior consistent statements.

Appellant's second argument concerning Ms. Valenta' is that the trial court erred in prohibiting Appellant from cross-examining her regarding their sexual relationship. Appellant avers that this line of cross-examination was relevant to rebut Ms. Valenta's claim that she was afraid of Appellant. However, Appellant did not attempt to cross-examine Ms. Valenta on this issue; counsel for Mr. Funt attempted to elicit this information from Ms. Valenta at which point the Commonwealth and counsel for Appellant objected. The objection was

sustained as Appellant was under indictment on charges of raping Ms. Valenta. This argument is clearly without merit.

Appellant's final allegation of trial court error in the guilt phase concerns the instructions given the jury on causation of death.[11] The assertion is that the charge as read was confusing, that it allowed the jury to reach a conclusion based upon pure speculation, and that the charge was legally incorrect. The portion of the charge at issue states as follows:

As to the causation required for criminal homicide, be it first degree murder, third degree murder, or involuntary manslaughter, you cannot find a defendant killed or caused the death of another person unless you are satisfied beyond a reasonable doubt that the defendant's conduct was a direct cause of death. In order to be a direct cause of a death, a person's conduct must be a direct and substantial factor in bringing about the death.

There can, however, be more than one direct cause of death. A defendant who is a direct cause of a death may be criminally liable even though there are other direct causes of death. A defendant is not a direct cause of a death if the occurrence of another event plays such an independent, important, and overriding role in bringing about the death compared with the role of the defendant that the defendant's conduct does not amount to a direct and substantial factor in bringing about the death.

A defendant's conduct may be a direct cause of death even though his conduct was not the last or even the immediate cause of death. A defendant's conduct may be a direct cause of death if it initiates an unbroken chain of events leading to the death of the victim. *A defendant whose conduct is a direct cause of death cannot avoid liability on the grounds that the victim's preexisting physi-*

11. We note that no objection was made at the time the charge was given. However, given our relaxed waiver rule in death penalty cases we will review the allegation. *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983).

*cal infirmities also contributed to his death.* (emphasis supplied).

Contrary to Appellant's assertions, the portion of the charge as set forth above is not confusing, it would not lead the jury to render a decision based upon speculation, nor is it an incorrect statement of the law. In fact, the above charge is taken almost verbatim from this Court's decision in *Commonwealth v. Hicks*, 466 Pa. 499, 353 A.2d 803 (1976).

In *Hicks*, this Court rejected the defendant's assertion that the evidence of causation of death was legally insufficient because the coroner had testified that the decedent had been drinking prior to the beating, and that the beating complicated a pre-existing heart condition thus, causing death. In that case we stated:

An accused may not escape criminal liability on the ground that, prior to the criminal act, his victim was not in perfect health, or the blow he inflicted was not mortal, or the immediate cause of death. If the blow started the chain of causation which led to the death, he is guilty of homicide.

*Id.* at 505, 353 A.2d at 805.

Additionally, Appellant argues that the portion of the charge referencing a pre-existing condition of the decedent, alcoholism, was improper as there was no evidence in the record to support that statement. To the contrary, the record is replete with references to the decedent's heavy, continuous consumption of alcohol. The charge as set forth was directly relevant to the facts of this case and a proper statement of the law. Accordingly, Appellant's objections to the above charge on causation are without merit.

### *Ineffective assistance of trial counsel*

The remaining allegations are brought forth as claims of ineffective assistance of trial counsel. The standard for reviewing an ineffectiveness claim is well settled:

The threshold inquiry in ineffectiveness of counsel claims is whether the issue/argument/tactic which counsel has foregone and which forms the basis for the assertion of ineffec-

tiveness is of arguable merit; for counsel cannot be ineffective for failing to assert a meritless claim. Once this threshold is met we apply the 'reasonable basis' test to determine whether counsel's chosen course was designed to effectuate his client's interests. If we conclude that the particular course chosen by counsel had some reasonable basis, our inquiry ceases and counsel's assistance is deemed effective. If we determine that there was no reasonable basis for counsel's chosen course then the accused must demonstrate that counsel's ineffectiveness worked to his prejudice. The burden of establishing counsel's ineffectiveness is on the appellant because counsel's stewardship of the trial is presumptively effective. [citations omitted].

*Commonwealth v. Weiss*, 530 Pa. 1, 5–6, 606 A.2d 439, 441–42 (1992).[12] In assessing a claim of ineffectiveness, where it is clear that Appellant has failed to meet the prejudice prong, the claim may be disposed of on that basis alone, without a determination of whether the first two prongs have been met. *Commonwealth v. Travaglia*, 541 Pa. 108, 661 A.2d 352 (1995).

■ Appellant's initial claim of ineffectiveness concerns counsel's failure to object to Cooper's testimony regarding Appellant's martial arts training. Appellant claims this testimony was highly prejudicial due to the nature of the assaults suffered by Gaffield and Stanley. The testimony at issue occurred during the direct examination of Cooper. Cooper testified that Appellant approached him as Cooper was engaged in martial arts exercises. Appellant stated that he was also a student of the martial arts and requested that he and Cooper train together; their conversation then turned to other matters. The martial arts issue was again brought out on cross-examination in an effort to attack the credibility of Cooper. Counsel for Appellant attempted to refute Cooper's

12. As we are reversing the sentence of death, we decline to review the ineffectiveness claims regarding counsel's actions in the penalty phase. In addition, we decline counsel's invitation to scour the record for additional errors caused by counsel and *sua sponte* raise said issues; the request is inappropriate and nonsensical in that such advocacy would be beyond the scope of our appellate review.

claim that he and Appellant were so close that Appellant confided to Cooper his involvement in the assaults on Gaffield and Stanley, by emphasizing that Cooper and Appellant, in fact, had never practiced their martial arts together. The intent of the cross-examination was clearly to dispute any inference of a close relationship between Cooper and Appellant. The above contains the entire reference to Appellant's martial arts skills brought to the attention of the jury. This testimony in its entirety was not so prejudicial to Appellant that its admission caused an adverse effect upon the outcome of Appellant's trial, therefore, counsel cannot be deemed ineffective for failing to object. *Commonwealth v. Davis*, 518 Pa. 77, 83, 541 A.2d 315, 318 (1988).

■■■ Appellant next asserts counsel erred in failing to request a *Kloiber* charge. In *Commonwealth v. Kloiber*, 378 Pa. 412, 106 A.2d 820 (1954), this court directed that the jury should be advised to review identification testimony with caution when the ability of the witness to actually observe the events at issue is doubtful:

[W]here the witness is not in a position to clearly observe the assailant, or he is not positive as to identification, or his positive statements as to identity are weakened by qualifications or by failure to identify defendant on one or more prior occasions, the accuracy of the identification is so doubtful that the Court should warn the jury that the testimony as to identity must be received with caution.

*Kloiber* at 424, 106 A.2d at 826–27.

Appellant argues that the testimony of Marlena Valenta and Allen Gaffield warranted a *Kloiber* charge because the witnesses were under the influence of alcohol, the room was dark, they had been awakened from sleep, and the events being observed were confusing. Appellant's objections relate to the credibility of the eyewitness testimony, not to the actual physical ability of the witnesses to observe from their respective positions in relation to the events. Accordingly, a *Kloiber* charge was not required in light of the facts in this case,

therefore counsel cannot be deemed ineffective for failing to request same.

The third allegation of ineffectiveness is the failure of counsel to preserve objections to the trial court denial of specific voir dire questions related to alcohol. This issue was previously discussed in the pre-trial section infra. As stated above, the scope of voir dire examination is a matter entrusted to the discretion of the trial court, the objective of said examination being the selection of a fair and impartial tribunal. Having already determined that the refusal to allow this line of voir dire was not error, we now conclude that counsel's failure to preserve this argument was not error.

The fourth allegation of ineffectiveness raises the failure of trial counsel to call two experts that would have testified regarding the unreliability of the testimony of Ms. Valenta and Mr. Gaffield due to their extreme alcoholism. This Court is incapable of addressing the merits of this allegation as Appellant has failed to set forth the identity of the "two" experts, the contents of their proposed testimony, or to even allege that they were in fact available at the time of trial and willing to testify on behalf of Appellant. Most important, however, Appellant does not demonstrate that trial counsel was aware of these witnesses, and with that knowledge, failed to present them on Appellant's behalf. *Commonwealth v. Hentosh,* 520 Pa. 325, 554 A.2d 20 (1989). Appellant has failed to demonstrate any ineffectiveness of trial counsel regarding the failure to call "two" expert witnesses.

Fifth, Appellant alleges trial counsel was ineffective in failing to raise the defense of "diminished capacity" based upon Appellant's history of alcohol abuse. The defense of diminished capacity is applicable in those instances when the defendant admits criminal liability but contests the degree of guilt. *Commonwealth v. Weaver,* 500 Pa. 439, 457 A.2d 505 (1983). Evidence of diminished capacity would in this case be in direct contradiction to the testimony of Appellant during the penalty phase, and that of his witnesses during trial. Appellant and his wife testified that he did not have a problem

with alcohol. The defense offered was a denial of any involvement in the assaults, a defense theory supported by Appellant's manifestations of concern over the physical state of Gaffield and Stanley, following their beating at the hands of the "Hood." Assuming the Appellant did not commit perjury when he denied involvement in the assaults, we must conclude that counsel did not err in failing to present a diminished capacity defense, as such would have been in direct conflict with Appellant's own testimony.

In his final allegation of ineffectiveness Appellant renews the argument made earlier as to the prosecution's selection of a "death qualified" jury. As noted above, this Court has consistently rejected this assertion of error. As there is no error in choosing a jury capable of imposing the sentence of death when the law requires the same; counsel cannot be ineffective in failing to interpose objections to this line of voir dire by the prosecution. *See Commonwealth v. Blount*, 538 Pa. 156, 647 A.2d 199 (1994).

### Penalty phase

We now turn to the penalty phase arguments. As we find it necessary to vacate the sentence of death, we will limit our discussion to the issue which compels our decision to reverse.

After deliberation in the penalty phase the jury found one aggravating circumstance: "during the commission of the offense the defendant knowingly created a grave risk of death to another person in addition to the victim of the offense;" and, one mitigating circumstance: the defendant is a good father and husband.[13] The jury then determined that the aggravating circumstance outweighed the mitigating circumstance, and unanimously agreed that the verdict should be death. Appellant argues that there was insufficient evidence to sustain the jury's finding of the aggravating circumstance. Appellant is correct.

---

13. The aggravating circumstance is set forth in 42 Pa.C.S. § 9711(d)(7); the mitigating circumstance is included within 42 Pa.C.S. § 9711(e)(8).

Aggravating circumstances must be proven by the Commonwealth beyond a reasonable doubt. 42 Pa.C.S. § 9711(c)(1)(iii). Sufficient evidence to support the application of the aggravating circumstance of creating a grave risk of harm to persons other than the murder victim, has been found by this Court in those instances where the other persons are "in close proximity" to the decedent "at the time" of the murder, and due to that proximity are in jeopardy of suffering real harm. A review of the cases where this Court has found sufficient evidence to support the existence of this aggravating circumstance is illustrative of what type of proximity between the action and the individuals is necessary to sustain such a finding.

In *Commonwealth v. Wilson*, 538 Pa. 485, 649 A.2d 435 (1994), the defendant fired shots in a crowded bar, killing the victim and endangering fifteen patrons. This scenario of the defendant firing shots within a defined area with several persons present was found sufficient to sustain the aggravating circumstance of causing a grave risk of harm to others in *Commonwealth v. Reid*, 533 Pa. 508, 626 A.2d 118 (1993); *Commonwealth v. Jones*, 530 Pa. 591, 610 A.2d 931 (1992); *Commonwealth v. McNair*, 529 Pa. 368, 603 A.2d 1014 (1992); *Commonwealth v. Rollins*, 525 Pa. 335, 580 A.2d 744 (1990); *Commonwealth v. Moser*, 519 Pa. 441, 549 A.2d 76 (1988); and *Commonwealth v. Smith*, 518 Pa. 15, 540 A.2d 246 (1988).

A variation on the theme of firing into a crowd occurred in *Commonwealth v. Logan*, 519 Pa. 607, 549 A.2d 531 (1988), which involved an ax-wielding defendant on a crowded bus. However, in a similar situation in *Commonwealth v. Stokes*, 532 Pa. 242, 615 A.2d 704 (1992), this Court upheld the application of this aggravating circumstance in part and reversed in part. In *Stokes*, three persons were murdered; two died when the defendant opened the walk-in refrigerator where he had confined four people, firing into the group, killing two persons, and wounding two others; the third victim was shot while alone in a different room. The application of the aggravating circumstance, creating a grave risk of harm to others, was upheld in relation to the victims within the refrig-

erator; but vacated as to the third victim, as no other persons were within the zone of danger at the time he was shot.

*Commonwealth v. Moore*, 534 Pa. 527, 633 A.2d 1119 (1993), *cert. denied Moore v. Pennsylvania*, —— U.S. ——, 115 S.Ct. 908, 130 L.Ed.2d 790 (1995); *reh'g. denied Moore v. Pennsylvania*, —— U.S. ——, 115 S.Ct. 1329, 131 L.Ed.2d 208 (1995); *Commonwealth v. Lambert*, 529 Pa. 320, 603 A.2d 568 (1992); *Commonwealth v. Ly*, 528 Pa. 523, 599 A.2d 613 (1991); and *Commonwealth v. Morris*, 522 Pa. 533, 564 A.2d 1226 (1989), each involved a robbery wherein the victims were shot while other persons where actually standing next to them or close enough to be within the zone of danger from a stray bullet.

In *Commonwealth v. Pierce*, 537 Pa. 514, 645 A.2d 189 (1994), the defendant set fire to his parents' home, causing the deaths of his father, mother, and grandmother, and endangering the life of his sister. In *Commonwealth v. Wharton*, 530 Pa. 127, 607 A.2d 710 (1992), the defendants endangered the life of their victim's seven month old child when after killing the parents, they abandoned the infant in the home in the dead of winter and turned off the heat as they left the house. In *Commonwealth v. Heidnik*, 526 Pa. 458, 587 A.2d 687 (1991) two women wearing metal chains were in the water filled pit along with the victim when she died as a result of electrical shocks administered by the defendant. In *Commonwealth v. Mitchell*, 528 Pa. 546, 599 A.2d 624 (1991), a grave risk of harm to others was created were the co-conspirators agreed to kill any potential witnesses who awakened during the murder of their intended victim.

In *Commonwealth v. Williams*, 532 Pa. 265, 615 A.2d 716 (1992), the victim was shot when he walked into the path of the bullet as the defendant fired into a car containing several persons. In *Commonwealth v. Stoyko*, 504 Pa. 455, 475 A.2d 714 (1984), *cert. denied, Stoyko v. Pennsylvania*, 469 U.S. 963, 105 S.Ct. 361, 83 L.Ed.2d 297 (1984), the defendant fired a shotgun into the window of a car, killing the driver and wounding the passenger.

■ From a review of the above cases it is clear that sufficient evidence to support this particular aggravating circumstance arises only in those factual situations where a nexus exists connecting the "other persons" to the zone of danger created by the defendants actions in killing the victim. This necessary nexus does not exist in the instant case.

James Stanley died in the early morning hours of Sunday October 4, 1991. The cause of death was mutually attributed to blunt force trauma and alcohol poisoning. Allen Gaffield was severely beaten on October 1, 1991. On October 3, 1991 Allen Gaffield received two additional blows to the face and chest. On October 3, 1991, approximately 18 hours before Stanley's death, Allen Gaffield obtained transportation to Hamot hospital in Erie County. When Allen Gaffield left Stanley's room Stanley was still alive, and according to Gaffield, Stanley refused to seek treatment for the injuries he had sustained in the beating the night before. Medical testimony established that the beating alone was insufficient to have caused Stanley's death; only after the ingestion of a large quantity of alcohol was death brought about. The alcohol was not administered to Stanley until after Gaffield had left the rooming house. At the time Appellant was engaged in the process of murdering Stanley, Gaffield was no longer within the zone of danger.

The Commonwealth argues that the injuries Gaffield suffered on October 1st were life threatening, and were compounded by the additional blows he received on October 3rd, when the process of killing Stanley began, therefore a grave risk of harm was in actuality suffered by Gaffield. Those facts however, are insufficient as a matter of law on the issue of whether or not Appellant knowingly created a grave risk of harm to Gaffield at the time he killed Stanley. The fact that Gaffield actually was injured prior to the death of Stanley under these circumstances is irrelevant. The risk of harm to others must occur or be imminent at the time of the acts leading to the death of the victim, for this aggravating circumstance to be applicable to a penalty determination. The facts of this case do not give rise to a finding that Appellant knowingly created a grave risk of harm to Allen Gaffield at

the time he murdered James Stanley. As the evidence was insufficient to sustain the only aggravating circumstance found by the jury, the penalty of death must be vacated. Therefore, in accordance with the clear language of the statute under which this Court conducts the required automatic review of a death sentence, this matter must be remanded for imposition of a sentence of life imprisonment. 42 Pa.C.S. § 9711(h)(4):

> If the Supreme Court determines that the death penalty must be vacated because none of the aggravating circumstances are supported by sufficient evidence or because the sentence of death is disproportionate to the penalty imposed in similar cases, then it shall remand for the imposition of a life sentence. If the Supreme Court determines that the death penalty must be vacated for any other reason, it shall remand for a new sentencing hearing pursuant to subsections (a) through (g).

Accordingly, the convictions for murder in the first degree, two counts of aggravated assault, and three counts of criminal conspiracy, as specifically set forth herein are affirmed. Only the judgment of sentence of death is vacated; all other sentences are affirmed. The case is remanded to the trial court for the imposition of a sentence of life imprisonment.

MONTEMURO, J., is sitting by designation.