J-S28032-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| CHRISTOPHER RYAN TUCKER | : | |
| | : | |
| Appellant | : | No. 1297 MDA 2021 |

Appeal from the Judgment of Sentence Entered September 14, 2021
In the Court of Common Pleas of Berks County
Criminal Division at No(s): CP-06-CR-0006044-2017

BEFORE: OLSON, J., McLAUGHLIN, J., and KING, J.

MEMORANDUM BY KING, J.:                     **FILED: MARCH 8, 2023**

Appellant, Christopher Ryan Tucker, appeals from the judgment of sentence entered in the Berks County Court of Common Pleas, following his jury trial convictions for first-degree murder, third-degree murder, two counts of aggravated assault, and two counts of possessing instruments of crime.[1] We affirm.

In its opinion, the trial court set forth the relevant facts of this case as follows:

> The Commonwealth presented evidence at trial that the victim, Tara Marie Serino, was last seen shortly after 12:30 A.M. on October 30, 2017, when she left her residence in Lehigh County, Pennsylvania with [Appellant]. The next day, the victim's father, Fred Serino, contacted the Pennsylvania State Police Hamburg Barracks ("PSP–

---

[1] 18 Pa.C.S.A. §§ 2502(a), 2502(c), 2072(a)(1), 2072(a)(4), and 907(a), respectively.

Hamburg"), after she failed to contact him as previously arranged. Mr. Serino requested they perform a welfare check on the victim at [Appellant's] residence at 282 Roth Road, Albany Township, Berks County, Pennsylvania. Troopers Jordan Hoffman and Ryan Zimmerman of PSP–Hamburg, responded to [Appellant's] residence [and] were unable to contact anyone inside the residence.

The following day, on November 1, 2017, [Appellant's] father appeared at [the] victim's father's house with the victim's purse, identification, medication, and wallet, which he indicated he retrieved from [Appellant's] residence. [Appellant's] father provided the victim's father with the victim's personal items. While at the Serino residence, [Appellant's] father indicated that his son had been committed to a hospital for psychiatric evaluation in the Urbana, Illinois area.

That same day, [the] victim's father reported her missing to his local police department, the Upper Macungie Police Department, and provided them with the victim's personal items. At that time, Detective Adam Miller of the Upper Macungie Police Department performed a presumptive blood test on what appeared to be a bloodstain on the victim's purse, receiving a positive indication for blood. Detective Miller confirmed that [Appellant] had been encountered attempting to break into a piece of farm equipment near a truck stop in Illinois and that the Iroquois County Sheriff's Department transported him to Presence Hospital in Urbana, Illinois. The victim was not located in the area. Detective Miller requested the Urbana, Illinois Police Department to respond to Presence Hospital to speak with [Appellant] to obtain information as to the victim's whereabouts. Detective Miller briefed Investigator Doug Pipkins of the Urbana Police Department as to the reason for his request.

Dr. Timothy Roberts was [Appellant's] treating psychiatrist and met with [Appellant] the morning of November 1. Dr. Roberts testified that while [Appellant] was a [l]ittle sleepy at times, he was not "out of it" and he was cooperative and capable of answering questions. Dr. Roberts indicated that [Appellant] had slept the night prior to his interaction with police. Dr. Roberts stated that [Appellant] was capable of

giving him a medical history and information about his medication, as well as answering questions regarding that history.

While [Appellant] raised that his medication was such that he could not understand what was happening, Dr. Roberts indicated that he was not prescribed any medication that would have precluded him from understanding what was going on, and that he was able to consent to the administration of medication. Dr. Roberts indicated that none of the dosages of the medications prescribed or given to [Appellant] would have sedated him to the point of an inability to communicate with others, including law enforcement officers. Dr. Roberts stated that [Appellant] had the ability to consent to medication. Dr. Roberts stated that [Appellant] signed a voluntary admission form, admitting himself to Presence Hospital.

Officer Darin McCartney, Officer Collin Dedecker and his Field Training Officer Ingram of the Urbana Police Department responded to Presence Hospital [to] assist with the missing person investigation involving the victim. They arrived at the hospital at 2:18 P.M., Central Time, November 1, 2017. There, they located [Appellant]. Officers Dedecker, Ingram and McCartney met with [Appellant] in a conference room on the fifth floor of the hospital.

The conference room contained a round table, chairs, and windows. [Appellant] was present with his social worker, Cymi Nappy, who left only once while Officers Dedecker, Ingram and McCartney met with him. Officer Dedecker informed [Appellant] that they had been referred an investigation to search for a missing person from a Pennsylvania police department. [Appellant] indicated to Officer Dedecker that he knew the victim, that they previously dated, but that he did not know her whereabouts and hadn't seen her for three weeks. Officer Dedecker also asked [Appellant] about some marks on his hands, and [Appellant] indicated he received these marks at work.

During the time Officer Dedecker spent with him, [Appellant] was not in handcuffs, was never told he was under arrest, and was informed that the police were simply investigating an individual's disappearance. [Appellant] was

willing to speak with Officer Dedecker, he never indicated that he did not wish to answer questions, he appeared to understand Officer Dedecker's questions, and he never indicated that he did not understand something.

Before entering the conference room, Officer McCartney was told a woman was reported missing by her father, she was possibly last seen with [Appellant], and that some of her personal belongings may have been found at [Appellant's] residence. At this point, Officer McCartney had no information that the woman may have been harmed. Upon entering the conference room, Officer McCartney spoke to [Appellant]. He asked for his biographical information, which [Appellant] provided. [Appellant] was willing to speak with Officer McCartney and did not appear to have any difficulty understanding his questions. Officer McCartney informed [Appellant] they were meeting because an individual who may have been [Appellant's] acquaintance or girlfriend was reported missing. Officer McCartney asked [Appellant] if he knew the victim. [Appellant] indicated that he did and that they had been dating approximately three months. Officer McCartney asked [Appellant] if he knew the victim's location. [Appellant] responded that he had an argument with her several days earlier and that after the argument, he left in his truck and drove toward Illinois. [Appellant] had originally indicated that he last saw the victim three weeks prior, but upon stating such, his social worker interjected that [Appellant] had indicated previously to her it may have only been several days prior. [Appellant] acknowledged this as true.

Officer McCartney also asked about the injuries to his hands, which [Appellant] first indicated he sustained from doing "sneak attacks" near a rest stop in Illinois, but later indicated he sustained doing martial arts. Officer McCartney inquired as to whether [Appellant] was concerned regarding the victim's whereabouts, and he indicated he was not. Detective McCartney inquired as to whether [Appellant] harmed the victim, and he indicated he did not. Officer McCartney met with [Appellant] for a total of approximately twenty minutes. During this time, [Appellant] did not indicate that he was unwilling to talk to the police. He never exhibited any signs of discomfort. He never requested to use the restroom. He was provided with water to drink. The

conference room in which they met was not locked and [Appellant] was free to get up and walk away.

Officer McCartney testified that, in his eleven years with the Urbana Police Department, he has been involved in multiple missing person investigations. He indicated that many of these investigations result in a finding of no harm or foul play, especially when it involves college aged individuals. However, he also indicated that, in missing person investigations, "time is of the essence," because the sooner a person can be located, the sooner they may be spared harm, or their life may be saved. At the time he spoke with [Appellant], he testified that he had no reason to believe the victim had been harmed or killed or that there was anything criminal to investigate. After meeting with [Appellant], Officer McCartney spoke with a sergeant at the Urbana Police [D]epartment to request assistance in the investigation.

A short time thereafter, Investigators Doug Pipkins and Richard Coleman arrived at the hospital. [Appellant] was still in the conference room with his social worker. Officer McCartney was also still present, but Officers Dedecker and Ingram had left. Officer McCartney briefly spoke with Investigator Pipkins to explain what [Appellant] had stated, and then Officer McCartney, Investigator Pipkins and Investigator Coleman entered the conference room. As before, at the time Officer McCartney and Investigators Pipkins and Coleman entered the conference room, [Appellant] was not under arrest, was not physically detained in any way and indicated he was willing to speak with investigators. Prior to entering the conference room, Investigators Pipkins and Coleman spoke with a nurse at the hospital who advised that [Appellant] would be "fine" to speak with the police. Officer McCartney was in police uniform, while Investigators Pipkins and Coleman were not.

Upon entering the conference room, Investigator Pipkins spoke with [Appellant]. He introduced himself and described [Appellant's] initial demeanor as "sleepy." Investigator Pipkins asked [Appellant] some initial questions regarding the victim's whereabouts. [Appellant] was responsive to Investigator Pipkins' questions. [Appellant's] answers correlated to the questions being asked.

[Appellant] never asked Investigator Pipkins to repeat questions or [state] that he did [not] understand what Investigator Pipkins was saying. Further, at the time he entered the conference room, Investigator Pipkins had no information as to where [the] victim might be or whether she had been harmed. Upon asking about the victim's whereabouts, [Appellant] initially told Investigator Pipkins that he had [not] seen her for about three weeks, but he eventually said it was about five to seven days. [Appellant] initially said he did [not] know where she was located.

Investigator Pipkins stepped out of the conference room to call Detective Miller of the Upper Macungie Police Department. Detective Miller informed Investigator Pipkins that he believed the information provided by [Appellant] probably was [not] accurate and the Upper Macungie Police Department had information that [Appellant] had seen the victim more recently. Investigator Pipkins re-entered the conference room and told [Appellant] that he had just spoken with Pennsylvania police and that the time frame [Appellant] provided did not match up with the information that Pennsylvania authorities had. Investigator Pipkins did not ask [Appellant] a question at this point; however, [Appellant] just began talking. [Appellant] asked Investigator Pipkins if he wanted to know what really happened. Investigator Pipkins responded "sure." [Appellant] then stated, "I will tell you what happened. I fucking killed her." While Investigator Pipkins had described [Appellant's] demeanor up to this point as "sleepy," when [Appellant] made the statement about killing the victim, [Appellant] is described as having "bolted up in his chair and was looking directly at us and was very engaged with what he was telling us and just very into the conversation.["]

Initially, Investigator Pipkins thought [Appellant] "was messing with us," but as [Appellant] continued to speak, Investigator Pipkins realized that [Appellant] might be serious. Investigator Pipkins stepped back out of the conference room and called Detective Miller to advise him of [Appellant's] statements and that the victim might be in [Appellant's] trailer. Investigator Pipkins called his sergeant to advise him of the same and then re-entered the conference room. Detective Miller subsequently called PSP-Hamburg to inform them of the situation. Upon re-entering

the conference room, [Appellant] was still in the middle of talking about the incident. Investigator Pipkins advised [Appellant] he was now being recorded. He then proceeded to read [Appellant] his **Miranda**[2] rights. [Appellant] indicated he did not want a lawyer and agreed to keep speaking with the investigators.

The audio recording was admitted into evidence at the…pretrial hearing…for the [c]ourt's review. The audio recording began at approximately 4:30 P.M., Central Time. The audio recording lasted about an hour. Prior to [Appellant] stating he killed the victim, Investigator Pipkins had been speaking with him for about ten to fifteen minutes. During the audio-recorded conversation, [Appellant] was provided food and drink. [Appellant] provided specific details as to how he killed the victim, even correcting Investigator Pipkins at one point regarding a detail. He also provided specific details regarding the crime scene. [Appellant] was free to move around the conference room, getting up out of his chair several times while speaking with Investigators Pipkins and Coleman. At the end of his conversation with Investigators Pipkins and Coleman, [Appellant] left the conference room. [Appellant] remained at Presence Hospital for the evening of November 1. The next day, November 2, 2017, Officer McCartney responded back to the hospital. At that time, he placed [Appellant] under arrest and, along with Officer Dedecker, transported [Appellant] to the county jail.

(Trial Court Opinion, 12/20/21, at 1-8).

After receiving information that the victim may be inside Appellant's home, officers with the Upper Macungie Police Department and the Pennsylvania State Police searched the Appellant's home. There, they saw dried blood and an odor consistent with decomposition. They found the victim's body under a rug, wrapped in a comforter. Her face was smashed,

---

[2] **Miranda v. Arizona**, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

and she had no signs of life. (N.T. Trial, 5/10/21-5/20/21, at 459-63). A later search of Appellant's residence revealed a marijuana joint, several earrings, a tooth, broken glass from a mirror, a bloody 25lb weight, and a bloody hatchet. (*Id.* at 484, 490-91, 500, 503, 505, 513-15, 535). During their search, officers found a dictionary at the crime scene which was open to the page containing a definition for the word "insane." (*Id.* at 525-27).

The Commonwealth subsequently charged Appellant with first-degree murder and related offenses. A jury trial commenced on May 10, 2021. Detective Pipkins testified at trial, explaining that Appellant admitted to strangling the victim, gouging her eyes out, shoving his fingers into her eye sockets, and then hitting her on the head with a weight. (*Id.* at 375). Appellant gave several reasons for having killed the victim including that she needed him to kill her, it was necessary for God, and he was attempting to liberate her soul. (*Id.* at 403). Appellant told Detective Pipkins that he was an agent for the government. (*Id.* at 409).

Dr. Supriya Kuruvilla, an expert in forensic pathology, testified that the victim received both blunt force and chop injuries to her head and neck and strangulation injuries. (*Id.* at 565). She stated that both of the victim's eyes were severely displaced. (*Id.* at 580). Dr. Kuruvilla determined that the victim was alive when her face and sternum were struck, and the injuries were consistent with being struck by the 25lb weight and hatchet. (*Id.* at 569-70, 581). Dr. Kuruvilla was unable to determine which injury actually killed the

victim, but she determined that the cause of death was massive blunt force and chop injuries of the head and neck and manual strangulation; the manner of death was homicide. (*Id.* at 586).

After the Commonwealth's case-in-chief, the defense presented a defense of legal insanity. The defense first called several individuals who testified as lay witnesses concerning Appellant's character and reputation in the community. The defense also introduced the testimony of two expert witnesses, Stephen Mechanick, M.D., and Gerald Cooke, Ph.D.

Dr. Mechanick was certified as an expert in the field of forensic psychiatry. (*Id.* at 2919). He testified that Appellant had a long history of mental illness and was diagnosed with bipolar disorder in 2006, which causes bipolar manic episodes including delusions and hallucinations. (*Id.* at 2922-24). During these delusions, Dr. Mechanick opined that Appellant becomes psychotic and believes that he is on a secret mission for the government. (*Id.* at 2927-30). Appellant has been hospitalized for these psychotic episodes several times since 2006. Dr. Mechanick testified that he evaluated Appellant shortly after his arrest and would diagnose him with schizoaffective disorder. He explained that Appellant told him that he killed the victim because she had been possessed by a dark spirit and he was freeing her. (*Id.* at 2947). Appellant told Dr. Mechanick that he left the state after the killing not because he was fleeing, but rather because he had other missions to complete, and he climbed into a farm combine (where he was finally captured) as part of training

for the government. (*Id.* at 2948-52).

Dr. Mechanick testified that he reviewed the report of the Commonwealth's expert, John S. O'Brien, M.D., J.D., and disagreed with Dr. O'Brien's conclusions. He emphasized that Appellant had a severe psychotic illness, which was present even when he was in prison, and was not on marijuana or bath salts, and opined that Appellant's mental illness was the cause of his behavior. (*Id.* at 2973-75).

Dr. Mechanick testified that Appellant's behavior was not a result of polysubstance abuse, but rather Appellant's psychosis led him to kill the victim. (*Id.* at 2952). Ultimately, he opined that Appellant's psychiatric condition at the time of the incident meets the legal definition of not guilty by reason of legal insanity. (*Id.* at 2962).

Appellant also called Gerald Cooke, Ph.D., as an expert in forensic psychology. (*Id.* at 3046). Dr. Cooke testified that Appellant was one of the two most psychotic persons he had ever encountered in his career as a forensic psychologist. (*Id.* at 3058). Dr. Cooke explained that Appellant knew the nature and quality of his act in killing the victim, but because of psychosis, he did not know that what he was doing was wrong. Rather, Appellant thought that what he was doing was right and good. (*Id.* at 3050, 3065). Dr. Cooke concluded that Appellant suffered from severe schizoaffective disorder with paranoid features. Schizoaffective disorder causes hallucinations and delusions. In addition, an individual with this disorder would have severe

depressive episodes and severe manic episodes where the individual would be most psychotic, delusional, and hallucinatory. (*Id.* at 3060-61).

Dr. Cooke explained that Appellant tends to recover from his psychosis when he is medicated, well rested, fed, and given water. In those instances, he begins to question whether some of the delusions and the things that he experiences are real. (*Id.* at 3073). Dr. Cooke explained that when the Commonwealth's expert, Dr. O'Brien, evaluated Appellant, he was no longer overtly psychotic and his symptoms were controlled by medication; therefore, he had much better insight as to whether his past experiences were delusions. (*Id.* at 3074, 3078). Dr. Cooke stated that he reviewed the expert report of Dr. O'Brien and questioned some of the findings and conclusions that were contained therein.

With respect to Appellant's drug use, Dr. Cooke noted that Appellant only tested positive for marijuana. He explained that although marijuana can cause psychosis, in this case, Appellant's psychosis was caused by either bipolar or schizoaffective disorder, as documented through many years of health professionals' diagnoses. (*Id.* at 3089).

Following the presentation of these witnesses, the Commonwealth offered the expert testimony of Dr. O'Brien to rebut the insanity defense. The court found that Dr. O'Brien was an expert in general psychiatry and forensic psychiatry. (*Id.* at 3192). Dr. O'Brien explained that marijuana can cause substance abuse psychosis and noted that its psychoactive component

increases when the drug is vaped. (*Id.* at 3201).[3] Dr. O'Brien then explained that although most people regard marijuana as harmless, it can cause psychosis and aggressive behavior at high doses or in susceptible individuals. (*Id.* at 3204). Dr. O'Brien explained that he saw evidence of both the mental health condition and the substance use disorder in Appellant. He then stated that he

> cannot determine the relative contributions of each and so I'm not able to say with medical certainty whether it's primarily a bipolar disorder or schizoaffective disorder with sort of a sideline diagnosis of cannabis use disorder or primarily cannabis use disorder that is making or causing [Appellant] to experience psychotic symptoms.

(*Id.* at 3206).

The defense moved to strike, arguing that the testimony was inadmissible because Dr. O'Brien's opinion lacked reasonable professional certainty. The court overruled the objection. (*Id.*) Defense counsel then moved for a mistrial or to strike Dr. O'Brien's entire testimony. The court denied the motion explaining that Dr. O'Brien was qualified to testify about the interaction of drugs and psychosis. (*Id.* at 3209).

Dr. O'Brien testified that Appellant's actions after the killing indicate an awareness that what he did was wrong. He noted that Appellant hid the body in a comforter under a rug, fled from the scene, and, when police eventually

_____

[3] The trial court overruled the defense objection to this testimony, explaining that there was a foundation for testimony concerning whether Appellant's psychosis was caused by drugs rather than a mental disorder. (*Id.* at 3203).

found him in the corn field, he told them that he was attempting to fix the combine. Then, when Appellant was later questioned about the victim's whereabouts, he minimized his involvement in the killing until he was pressed, at which point he eventually confessed. Based on this, Dr. O'Brien opined that Appellant knew the difference between right and wrong and knew that what he had done was wrong and he was in trouble. (*Id.* at 3214-15).

On cross-examination, defense counsel attempted to question Dr. O'Brien about his testimony in the case of ***Commonwealth v. Henry***, 524 Pa. 135, 569 A.2d 929 (1990), which involved a murder that occurred in 1986, and during the trial of which Dr. O'Brien had allegedly concluded the defendant was legally insane notwithstanding his drug and alcohol use. (N.T. Trial at 3249-51). The trial court denied counsel's request to take judicial notice of the facts of the case as set forth in our Supreme Court's opinion when the case was later appealed, but permitted defense counsel to question Dr. O'Brien about the case. The Commonwealth objected and the court explained that there is no meaningful comparison between the two cases and suggested that it would be misleading to the jury; however, the court allowed the questioning. (*Id.* at 3255). The Commonwealth objected to defense counsel's manner of refreshing Dr. O'Brien's recollection through the notes of testimony from ***Henry***. (*Id.* at 3262). The court explained that the line of questioning had turned into relitigating what happened in that trial and would mislead the jury and so therefore did not allow the questioning to continue. (*Id.* at 3263).

Following Dr. O'Brien's testimony, defense counsel called Frank Dattilio, Ph.D., as a rebuttal witness and expert in forensic psychology. Dr. Dattilio opined that Appellant did not know right from wrong when he killed the victim, and therefore met the standard for legal insanity. (*Id.* at 3363).

After the parties conducted their closing arguments to the jury, the court began its charge to the jury, explaining the presumption of innocence, and the Commonwealth's burden of proving Appellant's guilt beyond a reasonable doubt. (*Id.* at 3480). The court described the offenses charged and the elements of each offense, noting the Commonwealth's burden to prove each element beyond a reasonable doubt. The court used the Pennsylvania Suggested Standard Jury Instruction (Criminal) 5.01A to explain the difference between not guilty by reason of legal insanity and guilty but mentally ill; however, the court denied Appellant's request to read the bracketed portion of the instruction.

During deliberations, the jury returned with questions concerning the distinctions between the verdicts of guilty, guilty but mentally ill, and not guilty by reason of legal insanity. The court advised the jury that it could find Appellant guilty if it unanimously agreed that the defense failed to prove the affirmative defense of legal insanity. (*Id.* at 3530-33). Following deliberations, the jury found Appellant guilty of all charges.

On September 14, 2021, the trial court sentenced Appellant to life imprisonment for first-degree murder and imposed consecutive sentences of

two and a half to five years' imprisonment for each count of possessing an instrument of crime. The remaining counts merged with first-degree murder for the purposes of sentencing. Appellant did not file a post-sentence motion. Appellant filed a timely notice of appeal on October 8, 2021. On October 14, 2021, the trial court ordered Appellant to file a concise statement of errors complained of on appeal per Pa.R.A.P. 1925(b). Appellant timely filed his Rule 1925(b) statement on November 1, 2021.[4]

Appellant raises the following issues on appeal:

> A. Whether the trial court erred and abused its discretion by permitting the Commonwealth's sole expert witness to rebut the insanity defense, John S. O'Brien, MD, JD, to opine that [Appellant's] behavior at the time of the offense was not caused by mental illness, but by voluntary drugged condition, to wit, the "vaping" of marijuana, despite not holding said opinion to within a reasonable degree of medical certainty and not disclosing the grounds for his "vaping" testimony in his expert report?
>
> B. Whether the trial court erred and abused its discretion by unfairly and unreasonably impeding the defense's cross-examination, impeachment, and surrebuttal of the Commonwealth's only rebuttal witness to the insanity defense, John S. O'Brien, MD, JD, by: (i) failing to take judicial notice of the adjudicative facts contained in the official opinions of the Supreme Court of Pennsylvania in **_Commonwealth v. Henry_** on the grounds that said opinions do not contain "trustworthy evidence and information" and were "an erroneous summary" by some "law clerk"; (ii) failing to allow defense counsel to use the

---

[4] Appellant's eight-page statement of errors, containing ten errors with sub parts does not comply with Rule 1925(b)'s requirement that the statement "concisely identify each error" and that the statement not "provide lengthy explanations as to any error." **_See_** Pa.R.A.P. 1925(b)(4).

official transcripts from O'Brien's prior testimony in **Commonwealth v. Henry** to impeach his credibility and testimony concerning the insanity defense in [Appellant's case]; and (iii) unduly restricting the qualification and direct-examination testimony of forensic psychologist Frank M. Dattilio, Ph.D, the defense's only surrebuttal witness to O'Brien's testimony, to 10 minutes or less, while allotting to the Commonwealth an unrestricted amount of time for cross-examination, and less than 5 minutes to the defense for redirect examination?

C. Whether the trial court erred and abused its discretion by refusing to read the full content of paragraph 1 of Pennsylvania Suggested Standard Criminal Jury Instruction 5.01A (Insanity) requested by defense counsel—which differentiates the [not guilty by reason of insanity] and [guilty but mentally ill] special verdicts in understandable layman's language and in accordance with prevailing caselaw—when the jury interrupted its deliberations and returned with two questions indicating that it did not understand the trial court's insanity instruction and the differences between the verdicts of "Guilty," "Guilty but Mentally Ill," and "[Guilty] by Reason of Legal Insanity?"

D. Whether the trial court erred and abused its discretion by overruling defense counsel's objections to the prosecutor's closing argument, to wit, that if the jury returns a [not guilty by reason of insanity] verdict [Appellant] can be released immediately into the community, and that despite an involuntary commitment hearing conducted by the court immediately after the [not guilty by reason of insanity] verdict for the community's safety, the defense counsel can secure his immediate release into the community through expert witnesses— "hired guns"—who will say that he does not need to be committed, and by justifying said argument as "oratorical flair?"

E. Whether the jury's "Guilty" verdict is contrary to the law and to the weight of the evidence in that it: (i) was predicated upon an erroneous jury instruction from the trial court authorizing the jury to return a verdict of "Guilty" if it rejected the affirmative defense of insanity,

> in violation of this Court's pronouncement in **Commonwealth v. Andre**, [17 A.3d 951 (Pa.Super. 2011),] which requires the jury, after it finds that the defendant was not legally insane, to next determine whether the defendant was mentally ill at the time of the offense; and (ii) ignored substantial and irrefutable evidence of the accused's chronic mental illness, including at the time of the offense, introduced by both the Commonwealth and the defense?

(Appellant's Brief at 5-6).

Appellant's first issue on appeal concerns the testimony of the Commonwealth's expert, Dr. O'Brien, and raises four sub-issues: whether Dr. O'Brien's opinion was given to a reasonable degree of medical certainty, whether Dr. O'Brien's opinion concerning the effects of vaping was contained within his expert report, whether Dr. O'Brien's opinion was supported by the record, and whether Dr. O'Brien misstated the law with respect to the defense of legal insanity. We will address each sub-issue separately.

This Court's standard of review for issues regarding the admissibility of evidence is well settled:

> Questions concerning the admissibility of evidence are within the sound discretion of the trial court...[and] we will not reverse a trial court's decision concerning admissibility of evidence absent an abuse of the trial court's discretion. An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record. [I]f in reaching a conclusion the trial court [overrides] or misapplies the law, discretion is then abused and it is the duty of the appellate court to correct the error.

*Commonwealth v. Belknap*, 105 A.3d 7, 9-10 (Pa.Super. 2014), *appeal denied*, 632 Pa. 667, 117 A.3d 294 (2015) (internal citations and quotation marks omitted).

With respect to expert witness testimony, Pennsylvania Rule of Evidence 702 provides:

> **Rule 702. Testimony by Expert Witnesses**
>
> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge is beyond that possessed by the average layperson;
>
> (b) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; and
>
> (c) the expert's methodology is generally accepted in the relevant field.

Pa.R.E. 702.  Rule 703 of the Pennsylvania Rules of Evidence provides:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed.  If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.

Pa.R.E. 703.

Furthermore, we recognize that for an evidentiary ruling concerning the admission of expert testimony to constitute reversible error, "it must have been harmful or prejudicial to the complaining party.  A party suffers prejudice

when the trial court's error could have affected the verdict." **Commonwealth v. Taylor**, 209 A.3d 444, 449 n.3 (Pa.Super. 2019) (citation and quotation marks omitted).

Initially, by way of background, a defense of legal insanity is described in Section 315 of the Crimes Code, as follows:

> **§ 315.  Insanity**
>
> **(a) General rule.**—The mental soundness of an actor engaged in conduct charged to constitute an offense shall only be a defense to the charged offense when the actor proves by a preponderance of evidence that the actor was legally insane at the time of the commission of the offense.
>
> **(b) Definition.**—For purposes of this section, the phrase "legally insane" means that, at the time of the commission of the offense, the actor was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing or, if the actor did know the quality of the act, that he did not know that what he was doing was wrong.

18 Pa.C.S.A. § 315.

As authorized by Section 314 of the Crimes Code, a verdict of guilty but mentally ill is proper where the defendant has pursued an insanity defense and the trier of fact finds that the defendant is guilty and was mentally ill at the time of the offense, but not legally insane.  **See** 18 Pa.C.S.A. § 314(a).

> It has long been accepted that criminal defendants may be presumed sane for purposes of determining their criminal liability.  **Commonwealth v. Rabold**, 597 Pa. 344, [364], 951 A.2d 329, 341 (2008).  Thus, under the clear language of section 315(a), the burden of proving insanity by a preponderance of the evidence is upon the defendant.  **Commonwealth v. Heidnik**, 526 Pa. 458, 466, 587 A.2d 687, 690–691 (1991); **see also Commonwealth v. Reilly**,

519 Pa. 550, 564, 549 A.2d 503, 509–510 (1988) (summarizing the history of the defense of insanity in this Commonwealth). Moreover, we have long stated that "[t]he Commonwealth can prove an accused's sanity not only by psychiatric testimony but also by lay testimony which shows that he or she knew the nature and quality of the act committed and knew that what had been done was wrong." ***Commonwealth v. Frisoli***, [ 419 A.2d 1204, 1206 (Pa.Super. 1980)] (citing ***Commonwealth v. Demmitt***, 456 Pa. 475, 321 A.2d 627 (1974)). Furthermore, it is within the factfinder's right to disbelieve an insanity defense and credit the testimony of the eyewitnesses. ***Commonwealth v. Holley***, 945 A.2d 241, 249 (Pa.Super. 2008) (holding that the jury was within their rights to disbelieve the defendant's insanity defense and credit the testimony of the eyewitnesses).

***Commonwealth v. Yasipour***, 957 A.2d 734, 738–39 (Pa.Super. 2008), *appeal denied*, 602 Pa. 658, 980 A.2d 111 (2009).

Generally, "[n]either voluntary intoxication nor voluntary drugged condition is a defense to a criminal charge." 18 Pa.C.S.A. § 308. As our Supreme Court has explained, "an actor should not be insulated from criminal liability for acts which result from a mental state that is voluntarily self-induced." ***Henry, supra*** at 148, 569 A.2d at 935 (quoting ***Commonwealth v. Hicks***, 483 Pa. 305, 311, 396 A.2d 1183, 1186 (1979)). Hence, where the Commonwealth introduces evidence that a defendant was voluntarily intoxicated or under the influence of drugs, such evidence precludes a verdict of not guilty by reason of insanity, or guilty but mentally ill. ***Id.*** at 149, 569 A.2d at 935-36.

Appellant first claims that the trial court erred when it permitted the Commonwealth's expert, Dr. O'Brien, to opine, in response to Appellant's

assertion of the defense of legal insanity, that Appellant's psychotic behavior was proximately caused by voluntary drug use rather than mental illness. (Appellant's Brief at 29). Specifically, Appellant contends that Dr. O'Brien's statements that he "can't be sure what [Appellant's] diagnosis is" and that the "issue is more likely to be largely drug related, if not entirely, but I can't tell," demonstrate the lack of medical certainty which would have been required for the expert to form such opinion. (*Id.* at 29-30). We disagree.

It is well-settled that in Pennsylvania, "our Supreme Court has emphasized [that an] expert must base the substance of [his] opinion on a reasonable degree of certainty instead of mere speculation." ***Commonwealth v. Gonzalez***, 109 A.3d 711, 727 (Pa.Super. 2015), *appeal denied*, 633 Pa. 763, 125 A.3d 1198 (2015) (citation omitted). To determine whether an expert's opinion is rendered to the requisite degree of certainty, we must examine the expert's testimony in its entirety. ***Commonwealth v. Spotz***, 562 Pa. 498, 537, 756 A.2d 1139, 1160 (2000).

Here, Dr. O'Brien explained:

> In my instance looking at this case and evaluating [Appellant], I saw evidence of the two conditions, the mental health condition and the substance use disorder condition. I cannot determine the relative contributions of each and so I'm not able to state with medical certainty whether it's primarily a bipolar disorder or schizoaffective disorder with some sort of a sideline diagnosis of cannabis use disorder or primarily cannabis use disorder that is making or causing [Appellant] to experience psychotic symptoms. It could be either, but…

(N.T. Trial at 3206). The court overruled defense counsel's objection to this testimony, and denied counsel's motion for a mistrial based on this testimony, explaining that Dr. O'Brien is qualified to testify about the interaction of drugs and psychosis. (*Id.* at 3208-09).

Reviewing the totality of Dr. O'Brien's testimony, the record supports the trial court's conclusion. Dr. O'Brien's statement that he was not able to render an opinion to a reasonable degree of certainty was limited solely to a mental health diagnosis for Appellant. Dr. O'Brien explained that Appellant's drug abuse was both self-reported and evidenced through positive drug tests. Because this drug use was ongoing at the time of all relevant medical evaluations, Dr. O'Brien explained that he was unable to provide a specific mental health diagnosis to a reasonable degree of certainty.

Appellant's attempt to enlarge Dr. O'Brien's lack of certainty to encompass all opinions rendered is unavailing. As the court explained, Dr. O'Brien's other opinions concerning the interaction of drugs and psychosis, were all made to a reasonable degree of medical certainty. Significantly, Dr. O'Brien's opinion that Appellant was not legally insane when he murdered the victim, was given to a reasonable degree of medical certainty.

Accordingly, we conclude that the trial court did not abuse its discretion when it permitted Dr. O'Brien's testimony, despite Dr. O'Brien's statement that he could not render an opinion on Appellant's precise diagnosis to the requisite degree of certainty. *See Belknap, supra*.

Appellant next claims the trial court abused its discretion by admitting Dr. O'Brien's testimony concerning the effects of vaping marijuana, where such opinion was not mentioned in Dr. O'Brien's expert report. (Appellant's Brief at 30). Appellant complains that the defense was surprised and prejudiced at trial by this testimony, and the trial court should have either granted his motion to strike the testimony or granted a mistrial. We disagree.

Generally, in civil cases, an expert's testimony on direct examination is limited to the fair scope of the expert's report. **See** Pa.R.C.P. 4003.5(c). However, in criminal law, there is no rule of procedure similarly limiting expert testimony. **Commonwealth v. Roles**, 116 A.3d 122, 131 (Pa.Super. 2015), *appeal denied*, 633 Pa. 786, 128 A.3d 220 (2015) (stating: "[T]here are no specific procedural rules governing expert reports in criminal cases aside from Pa.R.Crim.P. 573, which relates to discovery"). **See also** Pa.R.Crim.P. 573 (requiring Commonwealth to disclose to defense results of any expert opinions, and providing that both parties have continuing duty to disclose evidence that is requested prior to trial and subject to disclosure).

Nevertheless, this Court has explained that neither the Commonwealth nor defendant has "*carte blanche* to allow an expert to testify beyond the information contained in his or her report." **Roles, supra** at 131-32. **See also Commonwealth v. Stith**, 644 A.2d 193, 198 (Pa.Super. 1994) (holding that where report contained language sufficient to notify defendant of expert's intent to testify in certain area, such testimony did not exceed fair scope of

expert's report).

Here, a review of Dr. O'Brien's expert report reveals several instances where Dr. O'Brien refers to Appellant's recorded medical history of substance abuse and describes instances where Appellant admits to using various drugs including marijuana. (*See* Commonwealth's Exhibit No. 130, at 2-11, 17, 22-23, 25-26). Although he does not specifically discuss "vaping" of marijuana, we conclude that the language in Dr. O'Brien's expert report sufficiently notified Appellant about Dr. O'Brien's intent to testify concerning the effects of marijuana use. Therefore, the trial court did not abuse its discretion in permitting Dr. O'Brien to testify concerning the psychotic effects of marijuana use, including the effects of vaping marijuana. *See Stith, supra*; *Roles, supra*; *Belknap, supra*.

Further, Appellant argues that Dr. O'Brien's opinion concerning Appellant's voluntarily drugged condition was not supported by the record. (Appellant's Brief at 31). Appellant contends that the toxicology tests performed after his arrest were negative for alcohol and all controlled substances other than marijuana. Therefore, Appellant argues the "*corpus delecti* rule" was violated because there was no real evidence that he was using drugs. (*Id.*) Accordingly, Appellant insists that Dr. O'Brien should not have been able to render an opinion as to Appellant's voluntarily drugged condition, because although he confessed to having done so, there was no evidence that Appellant used drugs. (*Id.* at 31-35). We disagree.

The *corpus delicti* rule is an evidentiary rule designed to guard against the danger of conviction based on a confession or admission where no crime was in fact committed. Specifically, "[t]he *corpus delicti* rule places the burden on the prosecution to establish that a crime has actually occurred before a confession or admission of the accused connecting him to the crime can be admitted." **Commonwealth v. Hernandez**, 39 A.3d 406, 410 (Pa.Super. 2012), *appeal denied*, 619 Pa. 700, 63 A.3d 1244 (2013) (quoting **Commonwealth v. Young**, 904 A.2d 947, 956 (Pa.Super. 2006), *appeal denied*, 591 Pa. 664, 916 A.2d 633 (2006)). "The historical purpose of the rule is to prevent a conviction based solely upon a confession or admission, where in fact no crime has been committed." **Id.**

As the Commonwealth has noted, Appellant does not cite any authority applying the *corpus delicti* rule to evidence that experts may consider in forming their opinions. Traditionally, the rule is used to emphasize the Commonwealth's burden in a criminal proceeding to prove that a crime had been committed. In this case, there is no question that a crime has been committed, in that Appellant killed the victim. The question of whether Appellant used drugs and was therefore suffering from a voluntary drugged condition is not an element of the offense itself; rather, it is a component of the Commonwealth's attempt to disprove Appellant's asserted insanity defense. Appellant identifies no legal precedent applying the *corpus delicti* rule in such circumstances.

Moreover, the record contains evidence of Appellant's drug use other than simply his admission to using marijuana. Appellant's toxicology screen when he was apprehended was positive for cannabis and Appellant's medical records, as referenced by experts for both defense and prosecution, detail a history of substance abuse. Under these circumstances, we conclude that the trial court did not abuse its discretion in permitting the Commonwealth's expert to testify concerning Appellant's drug use. **See Belknap, supra**.

Finally, Appellant contends that the trial court abused its discretion when it permitted Dr. O'Brien to give an erroneous standard for determining legal insanity. Appellant asserts that Dr. O'Brien's testimony that no single mental health condition makes an individual incapable of knowing right from wrong, was based on an incorrect legal standard of legal insanity. Specifically, Appellant contends that legal insanity must be the product of defect of reason from disease of the mind. (Appellant's Brief at 38). Therefore, Appellant asserts that Dr. O'Brien's testimony was a misstatement of the law, and the court abused its discretion in permitting this testimony. We disagree.

As this Court has explained, a defendant may successfully assert a legal insanity defense when he shows that "at the time of the commission of the offense, the actor was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing or, if…what he was doing was wrong." **Rabold, supra** at 347–48, 951 A.2d at 331 (quoting 18 Pa.C.S.A. § 315).

At trial, during the Commonwealth's direct examination of Dr. O'Brien, the prosecutor asked the following:

Q: Doctor, you've mentioned the different diagnosis [Appellant has] received over time. We have bipolar disorder, we have schizoaffective disorder, cannabis use disorder. In your medical opinion, does bipolar disorder make a person incapable of knowing the difference between right and wrong?

A. Absolutely not.

Q. Does the schizoaffective disorder make a person incapable of knowing the difference between right and wrong?

A. Absolutely not.

Q. How about psychosis?

A. Absolutely not.

Q. Schizophrenia?

A. No.

Q. Delusions?

A. No.

Q. Hallucinations?

A. No.

Q. Does any – cannabis use disorder?

A. No.

Q. Does any diagnosis this defendant has ever received make a person incapable of knowing the difference between right or wrong?

A. No. The—what I already said is that there is no automatic

> connection between any diagnosis and a person meeting the legal criteria of insanity, including an inability to know the difference between right and wrong….

(N.T. Trial at 3210-11).

Upon review, we conclude that Dr. O'Brien's answers did not misstate the law. Contrary to Appellant's assertion, Dr. O'Brien did not state that no disease of the mind would **ever** prevent a person from knowing right from wrong. Rather, he opined that there is **no automatic connection** between any diagnosis and a person knowing the difference between right and wrong. Accordingly, the trial court did not err in permitting this testimony. **See Belknap, supra**. Appellant's first issue merits no relief.

In his second issue presented on appeal, Appellant claims the court erred in limiting the defense response to Dr. O'Brien's testimony. Again, Appellant's question has two distinct sub parts. First, he complains that the court did not take judicial notice of the facts set forth in **Henry**, and that the court erred in limiting defense counsel's attempt to impeach Dr. O'Brien with his testimony in that case. Second, Appellant argues the court erred by imposing time limits on the testimony of the defense surrebuttal witness, Dr. Dattilio. We discuss each sub-issue separately.

Regarding his judicial notice claim, Appellant contends the trial court was mandated by Rule of Evidence 201(c) to take judicial notice of the facts of the Supreme Court's opinion in **Henry**, and pursuant to Rule of Evidence 201(f) was mandated to instruct the jury that it may, but is not required to,

accept as conclusive any fact judicially noticed. (Appellant's Brief at 41-42).

We disagree.

Rule 201 of the Pennsylvania Rules of Evidence concerns a court's taking judicial notice of adjudicative facts. It states:

**Rule 201. Judicial Notice of Adjudicative Facts**

**(a) Scope.** This rule governs judicial notice of an adjudicative fact only, not a legislative fact.

**(b) Kinds of Facts That May Be Judicially Noticed.** The court may judicially notice a fact that is not subject to reasonable dispute because it:

(1) is generally known within the trial court's territorial jurisdiction; or

(2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.

**(c) Taking Notice.** The court:

(1) may take judicial notice on its own; or

(2) must take judicial notice if a party requests it and the court is supplied with the necessary information.

**(d) Timing.** The court may take judicial notice at any stage of the proceeding.

**(e) Opportunity to Be Heard.** On timely request, a party is entitled to be heard on the propriety of taking judicial notice and the nature of the fact to be noticed. If the court takes judicial notice before notifying a party, the party, on request, is still entitled to be heard.

**(f) Instructing the Jury.** The court must instruct the jury that it may, but is not required to, accept as conclusive any fact judicially noticed.

Pa.R.E. 201.

Here, defense counsel requested that the court take judicial notice of the facts set forth in our Supreme Court's decision in *Henry, supra*. (N.T. Trial at 3246). The trial court noted that it was "not going to try that case in this case," observing that laying out the facts of both cases together would be misleading to the jury. (*Id.* at 3248). The court explained that bringing in the facts of the *Henry* case would "take us off into tangents that are out of [the court's] control" and would be asking the jury to "make a comparison from a 1986 case, the fact pattern there and all the rest of that and what this doctor said." (*Id.* at 3250). Defense counsel then explained that if the court was not going to let him use transcripts or get into the history of the case, the trial court should at least take judicial notice of one sentence from the Supreme Court decision in that matter. The trial court refused to do so.

Upon review, we see no abuse of discretion with the trial court's refusal to take judicial notice of the facts in *Henry*, a case completely unrelated to the one at hand, simply so that defense counsel could refresh the recollection of Dr. O'Brien after Dr. O'Brien testified that he did not recall certain portions of his testimony in that matter. *See generally Commonwealth v. Anderson*, 448 A.2d 1131 (Pa.Super. 1982) (holding court properly refused to take judicial notice of facts that were irrelevant to charges at issue).

Appellant further complains it was manifestly unreasonable for the trial court to prohibit the defense from using the official notes of testimony from

*Henry* to impeach Dr. O'Brien's testimony and credibility. (Appellant's Brief at 42). Appellant describes the notes of testimony as "a veritable treasure trove of O'Brien's contradictory and inconsistent statements concerning the defense of legal insanity, when compared to his testimony in [the instant case.]" (*Id.* at 43). Appellant argues that O'Brien's prior testimony in *Henry* was relevant to his testimony in the instant case and should have been permitted as either extrinsic or intrinsic evidence to impeach O'Brien's credibility. (*Id.* at 44). We disagree.

> "Evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence[,] and the fact is of consequence in determining the action." Pa.R.E. 401. "All relevant evidence is admissible, except as otherwise provided by law. Evidence that is not relevant is not admissible." Pa.R.E. 402. "The court may exclude relevant evidence if its probative value is outweighed by a danger of…unfair prejudice, confusing the issues, [or] misleading the jury[.]" Pa.R.E. 403.

*Commonwealth v. Kane*, 188 A.3d 1217, 1228 (Pa.Super. 2018), *appeal denied*, 649 Pa. 652, 197 A.3d 1180 (2018) (brackets in original).

Here, after the court denied counsel's request to take judicial notice of the facts summarized in the *Henry* decision, the court stated:

> I think there is no comparison in a meaningful way between the facts you're going to lay out here and the case that is in that courtroom. So I think it has to be misleading. It, I think, is a mistake on your part to go down that. I think it's prejudicial for the purposes that you're using it. And so I just wanted to let you know I'm going to let you do it. I'm going to be listening, though….

(N.T. Trial at 3255).

- 31 -

When defense counsel then asked Dr. O'Brien about the **Henry** case, Dr. O'Brien stated that he did not recall the specifics of the case but remembered that it was a brutal random killing. After defense counsel refreshed Dr. O'Brien's recollection showing him the transcripts from the trial in that case, Dr. O'Brien was able to answer several of defense counsel's questions. However, Dr. O'Brien could not recall specifically whether he testified in **Henry** in support of establishing an insanity defense, or in an attempt to reduce the verdict from first-degree murder to a lesser crime based on a lack of the requisite *mens rea*. (**Id.** at 3262). The court then met with counsel at sidebar and stated:

> This is exactly what I was afraid was going to happen. We're going to fight over what actually happened in that trial and you're going to try and use the transcript and … an opinion by the what, Supreme Court, maybe whose clerk summarized what they thought maybe they saw in the transcript that were facts to try and probe the premise that's going to get you – and I can already predict it. It's probably going to get you probably nowhere. But we're not going to do that. If he says he doesn't recall and you're going to try and refresh his recollection through various summaries of other people from 1986 [by way of the facts set forth in the **Henry** decision], nope. And if I am wrong, I'll live with it. But this is exactly what I was afraid was going to happen.

(**Id.** at 3262-63).

Upon review, we conclude that the trial court did not abuse its discretion when it limited defense counsel from cross-examining Dr. O'Brien using the notes of testimony from **Henry** or the factual summary set forth in the **Henry** decision. **See Belknap, supra**. Even if such evidence was relevant, the trial

court was permitted to exclude otherwise relevant evidence when its admission would have misled the jury. ***See Kane, supra***. This issue merits no relief.

Next, Appellant claims that it was unreasonable for the trial court to limit the time available for the surrebuttal testimony of Dr. Dattilio. Appellant insists the court was aware that Dr. Dattilio was only available to testify on May 19, 2021, and therefore unreasonably compelled defense counsel to conduct the direct examination of Dr. Dattilio "at a frenetic pace, and in a piecemeal manner" and then permitted the Commonwealth "to conduct a leisurely cross-examination of [Dr.] Dattilio without time restriction." (Appellant's Brief at 46) (emphasis omitted). Appellant claims the court compounded this error by limiting the redirect examination to under five minutes so that the court could adjourn for the end of the day at 4:30 p.m. Appellant submits that these time restrictions irreparably damaged his insanity defense. (***Id.*** at 48). We disagree.

Generally, trial courts have broad discretion in controlling trial conduct. ***Commonwealth v. Purnell***, ___ Pa. ___, ___, 259 A.3d 974, 980 (2021). Pennsylvania Rule of Evidence 611(a) states:

> The court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to:
>
> (1) make those procedures effective for determining the truth;
>
> (2) avoid wasting time; and

(3) protect witnesses from harassment or undue embarrassment.

Pa.R.E. 611(a). This Court reviews applications of Rule 611 for an abuse of discretion. *Purnell, supra*.

Here, we discern no abuse of discretion on the part of the trial court. The record demonstrates that when Dr. O'Brien's testimony went late into the afternoon, the court expressed its intent to break for the afternoon at that point and save Dr. Dattilio's testimony for the next day. Defense counsel explained that Dr. Dattilio was not available the next day and stated: "I'm on for 10 minutes and I'm done," "and set the clock for 10 minutes. I'll be done with my side." (N.T. Trial at 3359). Thus, the record shows that any time restrictions on the direct examination of Dr. Dattilio were self-imposed by Appellant because his expert was not available the following day. It was not an abuse of discretion for the court to break for the day at 4:30 p.m., and it was Appellant, not the court, who was responsible for making sure his witness was available to testify. Accordingly, Appellant's second issue on appeal merits no relief.

In his third issue on appeal, Appellant argues the court erred in omitting bracketed language from the Suggested Standard Jury Instruction, which was intended to assist jurors in distinguishing between the verdicts of not guilty by reason of legal insanity and guilty but mentally ill. Appellant asserts that he specifically requested that the entire suggested instruction be read and

referenced the bracketed portion of the instruction when crafting both his opening and closing arguments. Appellant insists the court abused its discretion by excluding the bracketed portion. (Appellant's Brief at 50-52). We disagree.

Our Supreme Court has set forth the relevant standard for jury instructions as follows:

> A trial court has wide discretion in phrasing jury instructions. When reviewing an allegation of an incorrect jury instruction, the appellate court must view the entire charge to determine whether the trial court clearly and accurately presented the concepts of the legal issue to the jury and should not reverse, as a result of the instruction, unless the trial court committed an abuse of its discretion. We will not examine a phrase or sentence of an instruction in a vacuum. Rather, when we evaluate a challenge to a charge, we must consider how each part fits together to convey a complete legal principle.

***Commonwealth v. Ragan***, 560 Pa. 106, 120-21, 743 A.2d 390, 397-398 (1999). ***See also Commonwealth v. Lesko***, 609 Pa. 128, 216, 15 A.3d 345, 397 (2008) (reiterating that charge, "as a whole," must be considered; court has broad discretion in phrasing instructions, so long as directions given "clearly, adequately, and accurately" reflect law). "The trial court commits an abuse of discretion only when there is an inaccurate statement of the law." ***Commonwealth v. Baker***, 963 A.2d 495, 507 (Pa.Super. 2008), *appeal denied*, 606 Pa. 644, 992 A.2d 885 (2010).

Additionally, "[t]he Suggested Standard Jury Instructions themselves are not binding and do not alter the discretion afforded trial courts in crafting

jury instructions; rather, as their title suggests, the instructions are guides only." ***Commonwealth v. Eichinger***, 631 Pa. 138, 178, 108 A.3d 821, 845 (2014).

In the instant case, the court instructed the jury as to the following:

Because the defendant has asserted an insanity defense, you will have to consider four possible verdicts. You will have to think about the special verdict of not guilty by reason of legal insanity and of guilty but mentally ill in addition to the ordinary verdicts of guilty and not guilty. Legal insanity excuses any crime including murder. A defendant has a complete defense to an otherwise criminal act if he was legally insane at the time he committed the act.

The test for insanity is legal, not medical. A person is legally insane if at the time of committing an alleged crime that person is laboring under such a defective reason from disease of the mind as to not to know the nature and quality of the act he is doing or if the person does know the nature and quality of the act, he does not know that what he is doing is wrong.

Stated more simply, a person is legally insane if at the time of committing an alleged crime that person is as a result of mental disease or defect either incapable of knowing what he is doing or if that person does know what he is doing is incapable of judging that it is wrong. The defendant has the burden of proving an insanity defense by a preponderance of the evidence. By preponderance, we mean it is a greater weight of the evidence…

The term mental disease or defect means a disease or infirmity of the mind as distinguished from a mere fault of character, personality, temperament, or social adjustment. Incapable of knowing what he was doing refers to the defendant's ability to know the physical aspects of his act. Ask yourselves, was the defendant aware of his physical act? Was he aware of the harmful consequences of his act?

Incapable of judging that what he was doing was wrong

refers to the defendant's ability to judge the legal and moral aspects of his act. Ask yourselves, was the defendant aware that he should not do the act because it was either legally or morally wrong? Even though a person believes that an act is right under his or her own individual moral code, the person is not insane if he or she…knows that the act is wrong under society's generally accepted moral standards.

Guilty but mentally ill becomes a possible verdict when a defendant offered but fails to prove a legal insanity defense. You may return this verdict if you are satisfied beyond a reasonable doubt that the defendant committed the crime alleged and you are also satisfied by a preponderance of the evidence, that is by the greater weight of the evidence, that the defendant, although not legally insane, was mentally ill at the time of the crime.

(N.T. Trial at 3488-90). The court went on to describe the legal meaning of the term mentally ill, and then explained that the jury should consider all relevant evidence when determining the questions of legal insanity and mentally ill. (*Id.* at 3490-91).

The court did not read the bracketed portion of the instruction, which provides:

[It may help you understand my subsequent instructions if you keep in mind why the law permits these two special verdicts. The verdict of not guilty by reason of legal insanity labels a defendant as sick rather than bad. It signifies that in the eyes of the law the person, because of mental abnormality at the time of the crime, does not deserve to be blamed and treated as a criminal for what he or she did. The verdict of guilty but mentally ill labels a defendant as both bad and sick. It means that in the law's eyes that person, at the time of the crime, was not so mentally abnormal as to be relieved from blame and criminal punishment for what he or she did, but that the defendant was abnormal enough to make him or her a likely candidate for special therapeutic treatment.]

Pa. SSJI (Crim), § 5.01A.

In its opinion, the trial court explained that the subcommittee note to Suggested Standard Jury Instruction 5.01A explains that the instruction will likely require tailoring to the facts of the particular case, and that the bracketed portion is "a summing up that may be omitted if the court wants a brief instruction." (Trial Court Opinion at 25) (quoting Pa. SSJI (Crim), § 5.01A, Subcommittee Note). The court suggests that excluding the optional commentary was at the discretion of the court and did not manifestly alter the presentation of law to the jury.

Our review of the record shows that the jury instruction, viewed as a whole, was sufficient to instruct the jury regarding the verdicts of guilty, guilty but mentally ill, not guilty by reason of legal insanity, and not guilty. *See Ragan, supra*. The trial court was not required to read the optional bracketed portion of the Suggested Standard Jury Instruction, and indeed was not required to use any portion of the Suggested Standard Jury Instruction to instruct the jury. *See Eichinger, supra*. Accordingly, we conclude that the court did not abuse its discretion, and Appellant's third issue merits no relief.

In his fourth issue, Appellant argues the trial court erred when it denied his request for a mistrial based on a statement made by the prosecution during closing arguments. Specifically, Appellant claims that the prosecutor aimed to inflame the jury when he stated that if it rendered a verdict of not guilty by reason of legal insanity "[t]here is no criminal consequence. There is nothing

hanging over his head. There is no guarantee he goes anywhere." (Appellant's Brief at 55) (quoting N.T. Trial at 3460). Appellant further contends that the prosecutor's suggestion—that if the jury found Appellant not guilty by reason of legal insanity, Appellant would find an expert to testify that he did not need to be involuntarily committed—was not oratorical flair but was calculated to fan the flames of the jury's fear and prejudice. (*Id.* at 58-59). Appellant insists that the trial court erred in permitting such statement, and a mistrial was warranted. We disagree.

Our standard of review of a claim of prosecutorial misconduct during closing arguments to the jury is whether the trial court abused its discretion. ***Commonwealth v. Jones***, 191 A.3d 830, 835 (Pa.Super. 2018).

> [W]ith specific reference to a claim of prosecutorial misconduct in a closing statement, it is well settled that any challenged prosecutorial comment must not be viewed in isolation, but rather must be considered in the context in which it was offered. Our review of a prosecutor's comment and an allegation of prosecutorial misconduct requires us to evaluate whether a defendant received a fair trial, not a perfect trial. Thus, it is well settled that statements made by the prosecutor to the jury during closing argument will not form the basis for granting a new trial unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant so they could not weigh the evidence objectively and render a true verdict. The appellate courts have recognized that not every unwise remark by an attorney amounts to misconduct or warrants the grant of a new trial. Additionally, like the defense, the prosecution is accorded reasonable latitude, may employ oratorical flair in arguing its version of the case to the jury, and may advance arguments supported by the evidence or use inferences that can reasonably be derived therefrom. Moreover, the prosecutor is permitted to fairly respond to points made in

the defense's closing, and therefore, a proper examination of a prosecutor's comments in closing requires review of the arguments advanced by the defense in summation.

*Id.* at 835-36 (quoting *Commonwealth v. Jaynes*, 135 A.3d 606, 615 (Pa.Super. 2016), *appeal denied*, 636 Pa. 672, 145 A.3d 724 (2016)). *See also Commonwealth v. Bryant*, 620 Pa. 218, 237, 67 A.3d 716, 728 (2013) (stating: "In addition, the prosecutor must be allowed to respond to defense counsel's arguments, and any challenged statement must be viewed not in isolation, but in the context in which it was offered") (citation omitted). Furthermore, "prosecutorial misconduct will not be found where comments were based on the evidence or proper inferences therefrom or were only oratorical flair." *Commonwealth v. Chmiel*, 585 Pa. 547, 619, 889 A.2d 501, 544 (2005) (citations omitted).

Here, during closing argument, the prosecutor stated: "[I]f you find the defendant insane, there is no criminal consequence. There is nothing hanging over his head. There is no guarantee he goes anywhere." (N.T. Trial at 3460). Defense counsel objected, and the court overruled the objection. The prosecutor then continued its argument explaining:

> When a defendant is found not guilty by reason of insanity, he is subject to an immediate court proceeding to decide whether he should be committed to a mental treatment facility. If committed, his commitment should continue until he is no longer dangerous to others or to himself. That's the law.
>
> Now, defense found three experts he retained to tell you that despite overwhelming evidence to the contrary, [Appellant] didn't know that killing Tara Serino was wrong.

- 40 -

> You think they're not going to find an expert to say he doesn't need to be in a treatment facility[?]

(*Id.*) Defense counsel objected again, and the court overruled the objection.

After the prosecutor's closing argument, Appellant requested a mistrial based on the prosecutor's statements. (*Id.* at 3474-75). The prosecutor responded that he brought up the criminal consequences and the commitment hearing because of defense counsel's statement that Appellant would either go to prison or an insane asylum. (*Id.*)

A review of the notes of testimony reveals that, during both his opening and closing statement, defense counsel explained that if Appellant was found not guilty by reason of legal insanity, he would be placed in a mental health facility, where "the walls of the prison and the walls of the asylum…they're the same." (N.T. Trial at 3451). Counsel then qualified this statement explaining that they do not have walls like a prison, "[b]ut they do have locked doors and it serves the same purpose." (*Id.*)

In this context, the prosecutor's comment represented a fair and permissible response to the defense. During his argument, defense counsel reassured the jury of Appellant's likely commitment if the verdict rendered were not guilty by reason of legal insanity. The prosecutor's statement that such commitment was not a guarantee, was made in response to these contentions. *See Bryant, supra*; *Jones, supra*. Accordingly, the trial court did not abuse its discretion by overruling Appellant's objections and denying a mistrial. Appellant's claim does not merit relief.

In his final issue, Appellant argues that given the overwhelming evidence of Appellant's mental illness, the jury's verdict of guilty, rather than either not guilty by reason of legal insanity or guilty but mentally ill, is a finding that shocks one's conscience and sense of justice. Appellant insists that no legal or factual basis existed for the jury to render a guilty verdict. Therefore, he claims he is entitled to a new trial because the verdict was against the weight of the evidence. (Appellant's Brief at 60-66).

Preliminarily, we must consider whether Appellant's challenge is properly before us. A defendant must raise a weight claim with the trial court in the first instance. **See** Pa.R.Crim.P. 607(A). Specifically, "a weight challenge must be preserved either in a post-sentence motion, a written motion before sentencing, or orally prior to sentencing." **Commonwealth v. Cox**, 231 A.3d 1011, 1018 (Pa.Super. 2020). "An appellant's failure to avail himself of any of the prescribed methods for presenting a weight of the evidence issue to the trial court constitutes waiver of that claim." **Id.**

Instantly, Appellant failed to raise any objection to the weight of the evidence in the trial court. Therefore, Appellant's claim is waived. **See id.**; Pa.R.Crim.P. 607(A). As such, Appellant's final issue merits no relief. Accordingly, we affirm.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/8/2023